612 A.2d 430

COMMONWEALTH of Pennsylvania, Appellee,

v.

Malcolm MEDLEY, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 5, 1991.

Decided June 17, 1992.

280

Daniel M. Preminger, Philadelphia, for appellant.

Ronald Eisenberg, Deputy Dist. Atty., Catherine Marshall, Chief, Appeals Div. and Alan Sacks, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

ZAPPALA, Justice.

This is an appeal from the Superior Court order affirming the judgment of sentence imposed on Malcolm Medley following his conviction for first degree murder, 18 Pa.C.S. § 2502, two counts of aggravated assault, 18 Pa.C.S. § 2702, carrying firearms on public streets or public property, 18 Pa.C.S. § 6108, criminal conspiracy, 18 Pa.C.S. § 903, and possessing instruments of crime, 18 Pa.C.S. § 907. We reverse.

On December 11, 1987, Michael Sanders was standing with Derval Hughes and Troy Brinkley in an area of the Abbotsford Projects in Philadelphia known as the "gully". The Appellant approached the gully, accompanied by a woman and another man. The Appellant wore a green army jacket and hat. The woman was identified as the Appellant's cousin, Carolyn Franklin.

The unidentified man indicated that they had drugs. Hughes and Brinkley confronted the trio and told them they could not come into the projects to sell drugs. A brief argument ensued. The Appellant and his male companion left, saying that they would be back. The two men walked past Christopher Sanders, Michael's brother, who overheard them say, "Let's get strapped.", i.e., get guns.

Sanders left the gully after the argument to drive around with a friend. He saw the Appellant and the other man leaving in a gold-colored Nissan Maxima from the area where Carolyn Franklin lived. Approximately forty-five minutes later, Sanders saw the vehicle returning to the projects. Three people were in the vehicle, but he could not identify them.

When his friend dropped him off, Sanders walked down a path to where Hughes and Brinkley were standing with several other people. As they all stood talking, they heard gunshots. Hughes pushed Sanders and Sanders fell. When Sanders stood up and looked, he saw that one of the shooters was wearing a green army jacket.

Sanders began to run down the path and was shot in the buttocks. He fell again, but stood back up and continued running. With Hughes running behind him, they ran to the house of one of the neighbors in the project.

Sanders testified that he heard more than one gun. It sounded to him as if two weapons were being fired, one an automatic and the other a revolver. Sanders identified the Appellant as the shooter who wore the green army jacket.

Joel Allen was in the project when the shooting took place, although he did not witness the actual shooting. He heard a lot of gunshots that sounded as if they were fired from more than one weapon. Two men ran past Allen while he was running away. Allen identified one of the men as the Appellant's co-defendant, Shelton Alford. Alford pointed a gun at Allen, pulled the trigger and clicked on an empty chamber twice.

The police were called to the scene. Hughes' gunshot wounds were fatal. Sanders had been shot once. Shannon Muse, another bystander, had been hit by three bullets.

Detective Michael Bittenbender was involved in the investigation of the shootings. From interviews with the victims and other witnesses, Bittenbender was aware that a gold Nissan Maxima had been seen in the area of the project at the time of the shootings. During his interview with Carolyn Franklin on the day after the incident, he learned that Franklin and the Appellant were cousins. He advised other police officers, including Officer Sean Dillon, to be on the alert for the vehicle.

Officer Dillon had been given the description and the license number of the vehicle. Detective Bittenbender specifically identified the Appellant by name as the owner of the vehicle. Bittenbender told Dillon that the Appellant was related to a woman who lived in the project. Bittenbender informed him that the Appellant may have had something to do with the homicide or had knowledge about the incident.

One week after the shooting, Officer Dillon spotted the vehicle while on patrol. The Appellant was driving the vehicle and Alford was in the front passenger seat. Dillon then contacted the Homicide Division.

Detective Bittenbender was not on duty, but another detective told Dillon to stop and hold the vehicle. Dillon was told that the detectives wanted to talk to the men. Dillon saw the vehicle again at a stop sign, pulled up behind and stopped it.

Officer Dillon had previously checked the information on the Appellant and knew that his license had been suspended. He told them that the detectives wanted to talk to them about the homicide. The Appellant did not respond.

The Appellant and Alford got out of the vehicle. Dillon patted them down for weapons. No weapons were found. Both men were then handcuffed and placed into the back of the police car.

They were taken to the police station for questioning by other police officers. Officer Dillon stayed behind with the Appellant's vehicle. The vehicle was subsequently impounded.

Detective Francis Ansel was present when they were brought into the station. The officers informed him that they were looking for a car involved in a shooting, that they had reason to believe that this might be the car or similar car, and they had stopped the two men in the car. Detective Ansel spoke with both men and later took a formal statement from Alford.

The Appellant was placed in a waiting area while Detective Ansel questioned Alford. The door to the waiting area was locked. In order to leave the waiting area, a buzzer system would have to be activated to unlock the door. The buzzer system was controlled by a police detective who stood guard at the front desk.

Approximately four hours had elapsed from the time the Appellant had been stopped by the police until he was interrogated by Detective John Denham. Detective Denham was called into the station from home and arrived shortly after midnight. The Appellant gave a statement in which he said that he went to the project with Michael Couch on December 11, 1987, but left when residents threatened him. He stated that he then went to a party at the Holiday Inn at 18th and Market Street for the remainder of the night.

No *Miranda* warnings were ever given to the Appellant by any of the police officers. The Appellant was released once he had given a statement. He was informed that his vehicle would be confiscated until he produced his vehicle registration and a driver's license. On December 28, 1988, the police obtained a warrant to search the vehicle. A search of the car produced a green army jacket, a plastic bag containing white powder, and vials. On February 17, 1988, the Appellant and Alford were arrested.

Prior to trial, the Appellant filed a Motion to Suppress Statement and Physical Evidence which was denied. The Appellant argues that the trial court erred in denying his motion to suppress his statement and the physical evidence seized from his vehicle. With regard to his statement, the Appellant contends that his statement was the product of a

custodial interrogation and should have been suppressed since no *Miranda* warnings were given.

In reviewing the trial court's ruling, our initial task is to determine whether the factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous. *Commonwealth v. Johnson,* 467 Pa. 146, 151–52, 354 A.2d 886, 889 (1976).

At the hearing on the suppression motion, Detective Bittenbender testified that he had interviewed Carolyn Franklin on December 12, 1987, and Michael Sanders on December 14, 1987. He knew that the Appellant was her cousin and that the Appellant was involved in the argument that had occurred earlier at the project. He also had information that the Appellant's vehicle had been seen in the project at the time of the shooting and was seen leaving the project immediately after the homicide.

Officer Dillon testified that the Appellant's name was given to him as the owner of the gold Nissan Maxima. Detective Bittenbender informed him that the vehicle had been seen in the project on the night of the homicide. He was told that the Appellant may have had something to do with the homicide or may have known something.

The police were specifically on the lookout for the Appellant in connection with the incident. When Officer Dillon stopped the vehicle on December 18, 1987, the Appellant and Alford were told to get out of the car. They were informed that the police wanted to speak with them about a homicide that had occurred.

Both were frisked. Although neither of them was carrying a weapon, they were handcuffed and immediately transported to the police station. The officer never told them that they

did not have to go to the police station if they did not want to or that they were free to leave at anytime.

Alford and the Appellant were separated and interrogated at different times. Alford was searched in the interrogation room and asked to empty the contents of his pockets before being questioned. Detective Ansel testified that it would not be normal police procedure to ask a person who is not a suspect to take the contents out of his pockets.

While Detective Ansel questioned Alford, Medley was kept in the waiting area. The door to the waiting area was locked. The buzzer system had to be activated by the detective at the front desk before anyone was permitted to leave.

The Appellant was released after he gave his written statement to the detective. No *Miranda* warnings were given by the officers prior to questioning and taking the written statements from the Appellant and Alford. During Detective Benham's questioning, the Appellant was never told that he was free to leave.

■ Before an individual is subjected to custodial interrogation, he must make a knowing and intelligent waiver of his privilege against self-incrimination and right to counsel after adequate warning as to those rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260 (1977).

The test for determining whether or not a person is in custody for *Miranda* purposes is whether he "... is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation...." *Commonwealth v. O'Shea,* 456 Pa. 288, 292, 318 A.2d 713, 715 (1974), cert. denied 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974), (emphasis deleted; citation omitted). The test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator.

It is of no significance that the Appellant was not arrested until February, 1988. "... [C]ustodial interrogation does not require that the police make a formal arrest, nor that the

police intend to make an arrest. Rather, the test of custodial interrogation is whether the individual being interrogated reasonably believes his freedom of action is being restricted." *Commonwealth v. Brown*, 473 Pa. at 570, 375 A.2d at 1264 (citations omitted.)

█ Applying this standard, we conclude that the conduct of the police officers placed the Appellant in a situation in which he could have reasonably believed that his freedom of movement was restricted. The Appellant was frisked, placed in handcuffs, transported to the police station, and placed in a secured waiting area until being interrogated. Indeed, it would be difficult to imagine a situation more likely to produce a belief that one's freedom of movement is restricted than that of being frisked, handcuffed, and transported to a police station.

The Commonwealth cites our decision in *Commonwealth v. Horner*, 497 Pa. 565, 442 A.2d 682 (1982) as controlling. In *Horner*, the appellant sought to suppress his written statement to the police on the basis that it was the product of custodial interrogation and had not been preceded by *Miranda* warnings. The police had arrived at the scene of a shooting. After the police had arrested a woman who told them that she had shot the victim, they told the appellant and several others that they were going to be taken in for questioning as witnesses. The police then transported the men in a van to a police administration building.

The facts underlying the *Horner* decision are distinguishable in a critical respect. Unlike the instant case, none of the men were frisked or handcuffed before being transported for questioning. Nor were any of the men believed to be involved in the shooting. Unlike the Commonwealth, we do not underestimate the significance of being frisked and handcuffed and the impact of such conduct on one's reasonable belief that freedom of movement has been restricted.

The trial court erred in concluding that the Appellant's statement was not the product of a custodial interrogation and

in failing to suppress the statement. The judgment of sentence is vacated and the matter is remanded for a new trial.[1]

McDERMOTT, J., notes his dissent.

---

1. The Appellant has raised the following additional issues: (1) whether the physical evidence seized from the vehicle should have been suppressed; (2) whether the trial court improperly admitted the statements made by Shelton Alford; (3) whether the trial court erred in permitting a homicide detective to testify about the packaging and sale of drugs; and (4) whether trial counsel was ineffective. We have examined the additional claims and conclude that they are meritless.