634 A.2d 1120

COMMONWEALTH of Pennsylvania

v.

Robert IANNELLI, Appellant.

COMMONWEALTH of Pennsylvania

v.

Kathryn YOHE, Appellant.

COMMONWEALTH of Pennsylvania

v.

Rodney IANNELLI, Appellant.

COMMONWEALTH of Pennsylvania

v.

Albert DIULUS, Appellant.

COMMONWEALTH of Pennsylvania

v.

Ralph Raymond ROMANO, Appellant.

Superior Court of Pennsylvania.

Argued May 12, 1993.

Filed Oct. 18, 1993.

Reargument Denied Dec. 27, 1993.

404

406

Ellen M. Viakley, Pittsburgh, for appellants.

Mary B. Seiverling, Deputy Atty. Gen., Harrisburg, for Com., appellee.

Before McEWEN, OLSZEWSKI and FORD ELLIOTT, JJ.

OLSZEWSKI, Judge.

These cases arose out of an investigation of illegal gambling activities in western Pennsylvania conducted by the Pennsylvania State Police and the Pennsylvania Attorney General's Office. The lead investigator was Trooper Robert Teagarden. In March of 1989, Trooper Teagarden contacted a confidential informant in Uniontown, Fayette County. The informant agreed to have his conversations with Joseph Georgianna tape recorded. During these conversations, the informant and Georgianna discussed line information (the odds on sporting events) and placed wagers on sporting events. Based upon the information uncovered, Trooper Teagarden applied for a search warrant for the toll records for Georgianna's phone. He also applied for a pen register to be placed on Georgianna's phone [1] which reveals all outgoing calls made. Eventually, a trap and trace device was also placed on this phone line to trace incoming calls.

The trap and trace device revealed that phone calls from (412) 429–8033 were regularly received from 6:00 to 8:00 p.m., "prime time" betting hours. Telephone records revealed that Pasquale Romano subscribed to this number. In October 1989, a court-authorized pen register was placed on the Romano telephone. Subsequently, a trap and trace device was also authorized for that phone line. The evidence obtained from these devices and physical surveillance led the police to believe that Pasquale Romano and/or Ralph Raymond Romano were involved at a high level in a gambling organization. At times of heavy sports betting (Saturdays, Sundays and Monday nights), the number of calls placed from the Romano number increased dramatically. This pattern was consistent with bookmaking operations where a bettor places a call to a beeper and the bookmaker then calls the bettor. The monitoring of the Georgianna phone line supported this belief. When calls were placed to a beeper service from the Georgian-

1. The phone number was (412) 437–7940.

na phone line, a call would be received moments later from the Romano phone. Based upon this information, this Court authorized a wiretap for the Romano phone.

Officer Teagarden monitored this wiretap from November 17, 1989, through December 6, 1989, documenting conversations between Ralph Raymond Romano ["Romano"] and several other people. The Romano wiretap also revealed numerous conversations regarding gambling activity between Robert Iannelli ["Iannelli"] and Romano. These would often occur after Romano called a beeper number and then Iannelli phoned Romano from cellular phones. These patterns were consistent with the earlier patterns between Georgianna and Romano. Accordingly, the police suspected that Romano was a lower level bookmaker reporting to Iannelli, a higher level bookmaker. As a result of this information, a wiretap was obtained for 551–6033 and 551–8197, the two cellular phones.[2] In addition to authorizing these wiretaps, the Superior Court also authorized the use of pen registers and trap and trace devices.

The wiretaps revealed that Iannelli was running illegal numbers and lotteries. Romano, Albert Diulus ["Diulus"], and Kathryn Yohe ["Yohe"] all placed bets with Iannelli, acting as lower echelon bookmakers. In addition to the wiretapping, the police also performed physical surveillance and other investigations on appellants. Search warrants were authorized for numerous locations through which physical evidence was also obtained.

Iannelli, Romano and Diulus were charged with one count of criminal conspiracy, 18 Pa.C.S.A. § 903, one count of corrupt organizations, 18 Pa.C.S.A. § 911, twelve counts of pool selling and bookmaking, 18 Pa.C.S.A. § 5514 and twelve counts of lotteries, 18 Pa.C.S.A. § 5512. Yohe was charged with one count of criminal conspiracy, one count of corrupt organizations and five counts of pool selling and bookmaking. The

2. The subscribers of these phones were Jodi Hightower and Don Gaby; however, the surveillance revealed that appellant Iannelli utilized the phones. Indeed, Iannelli often personally paid the bills for these telephones in cash.

four cases were joined for trial. Appellants filed pre-trial motions, arguing, among other things, that the wiretap evidence and other physical evidence should be suppressed. The trial court denied the motions and conducted a non-jury trial. Appellants were convicted on all counts except violating the Corrupt Organizations Act. The trial court imposed sentences on April 27, 1992. For criminal conspiracy, the trial court sentenced Iannelli, Romano and Diulus to 8 to 23 months imprisonment, plus costs and a $10,000 fine. They also received a $5,000 fine, costs, and 5 years of probation for one count of bookmaking and pool selling, to run consecutively to the imprisonment. Sentence on the remaining counts was suspended. Yohe was sentenced to two years probation, plus costs for criminal conspiracy; no other penalty was imposed on the remaining counts. Post-trial motions were filed, argued and denied. These timely appeals followed. These appeals have been consolidated by stipulation of the parties. Iannelli filed a brief with this Court in which the other three appellants join.[3]

On appeal, six issues are presented for our review. The first issue is common to all appellants, including Rodney. The remaining issues pertain only to Iannelli and Rodney. Appellants allege that the evidence obtained pursuant to wiretaps should have been suppressed because:

3. Rodney Iannelli ["Rodney"], Robert Iannelli's son, was also charged with one count of criminal conspiracy to commit the crime of pool selling and bookmaking and one substantive count of pool selling and bookmaking. Rodney waived his right to a jury trial and requested a determination of guilt or innocence based on the testimony at the preliminary hearing as well as the notes of testimony from other appellants' trials. The trial court found Rodney guilty of both counts. He adopted the post-verdict motions of the other appellants which were denied. Rodney was sentenced to six months probation and a $1,000.00 fine. His timely appeal followed. Rodney filed his appellate brief late and therefore did not present argument with the other appellants. He adopts the arguments presented by Iannelli.

Regarding one issue, we must make a separate note, however. Rodney contends that the gambling laws of Pennsylvania are unconstitutional, relying again on Iannelli's brief. Iannelli, however, has not presented this argument. Therefore, it is waived. *See* Pa.R.A.P., Rule 2119, 42 Pa.C.S.A. and *Commonwealth v. Gonzalez,* 415 Pa.Super. 65, 608 A.2d 528 (1992).

A.   The orders authorizing electronic surveillance, pen registers and trap and trace devices were not issued by a court of competent jurisdiction;

B.   The orders authorizing pen registers and the governing statute limited surveillance to outgoing calls, but the pen registers installed measured the date, time and duration of incoming calls;

C.   There was no probable cause for the electronic surveillance of the (412) 551–6033 and (412) 551–8197 phone lines.

D.   The Wiretapping and Electronic Surveillance Control Act is unconstitutional.

In addition to the wiretap questions, the Iannellis claim that:

the description of property in the search warrants were unconstitutionally overbroad;

the affidavit for three search warrants did not provide probable cause to believe that evidence subject to seizure would be found at the places to be searched;

the search warrant for a garage was tainted by prior illegality of other search warrants;

the evidence was insufficient evidence to convict him of twenty of the twenty-four pool selling and bookmaking and lotteries counts;

the monitors' logs containing summaries of the intercepted telephone conversations were improperly admitted into trial.

We find no merit to any of these issues and affirm the judgments of sentence.

## I.   SUPPRESSION OF WIRETAP EVIDENCE

In the first issue, appellants argue that the wiretap evidence should have been suppressed for various reasons.   In reviewing the denial of a motion to suppress evidence, we must first determine

whether the factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evi-

dence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings, we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Medley,* 531 Pa. 279, 283, 612 A.2d 430, 432 (1992); *McElrath v. Commonwealth,* 405 Pa.Super. 431, 435, 592 A.2d 740, 742 (1991). In this case, the trial court denied appellants' motion to suppress. Its findings of fact and conclusions of law are not part of the record before us. The suppression court is required to place findings and conclusions on the record pursuant to Pa.R.Crim.P., Rule 323(i), 42 Pa. C.S.A. Failure to do so can be problematic:

> Both this Court and our Supreme Court have expressly disapproved of this practice and have, when necessary, vacated judgment of sentence and remanded for a new suppression hearing. Where possible, however, we have looked to the trial court's resolution of post-trial motions, as well as the record, in order to determine the propriety of suppression orders in these situations.

*Commonwealth v. Gelber,* 406 Pa.Super. 382, 394, 594 A.2d 672, 678 (1991), *alloc. denied,* 529 Pa. 667, 605 A.2d 332 (1992) (citations omitted). Here, we can ascertain the propriety of the suppression order without the benefit of the trial court's findings. Accordingly, we are not required to vacate and remand, but can address the suppression issue raised by appellants.

## A. Lack of Competent Jurisdiction

■ Appellants first allege that the Superior Court lacks jurisdiction to issue wiretaps. Specifically, they argue that because § 741 of the Judicial Code establishes that "[t]he Superior Court shall have no original jurisdiction," this section is violated when judges of this Court authorize wiretaps. This argument, however, incorrectly presumes that issuing a wiretap is an act of original jurisdiction. We acknowledge that we must make factual determinations as to whether the wiretap applicants have established a sufficient basis upon which to

enter an order. 18 Pa.C.S.A. § 5710. Moreover, the reviewing judge

> may inquire *in camera* as to the identity of any informants or any other additional information concerning the basis upon which the investigative or law enforcement officer or agency has applied for the order of authorization which the judge finds relevant in order to determine if there is probable cause pursuant to this section.

*Id.* Despite these factfinding powers, we do not find the issuance of a wiretap to be an act of original jurisdiction.

Black's Law Dictionary defines "original jurisdiction" as, "[j]urisdiction in the first instance" or "[j]urisdiction to take cognizance of a cause at its inception, try it, and pass judgment upon the law and facts." The issuance of a wiretap is not a cause of action and therefore does not fit this definition. Further, our review of the application for a wiretap certainly does not equate to a trial. Accordingly, we do not find that issuing a wiretap is an act of original jurisdiction.[4]

In addition to their original jurisdiction argument, appellants also assert that if the Wiretap Act is read as conferring jurisdiction on the Superior Court, Art. 5, § 9 of the Pennsylvania Constitution is violated. This section provides that a defendant has a right of appeal from a judgment of conviction. According to appellants, this right requires review by an impartial tribunal. We agree. We disagree, however, with appellants' contention that when a wiretap is

---

**4.** Even if authorizing a wiretap is an act of original jurisdiction, appellants' claim would still fail for the reasons relied upon by the trial court. The Pennsylvania Constitution states that the Superior Court's jurisdiction shall be established by the Constitution or the General Assembly. Pa.Const. Art. V, § 3. In accordance with this power, our legislature decided that the Superior Court should be the issuing body for wiretaps. *See* 18 Pa.C.S.A. §§ 5702 and 5708. Moreover, we agree with the trial court that,

> [t]he fact that the Pennsylvania General Assembly chose to delegate jurisdiction to the Superior Court through enactments within the Pennsylvania Wiretap Law, as opposed to amendment of the Pennsylvania Judicial Code, is of no import to the validity of the Superior Court's power to act under such a legislative grant of authority to issue process.

Trial court opinion at 4.

issued by this Court, a defendant will not receive impartial review of his appeal. As the trial court noted, if the issuing judge was on the panel reviewing the defendant's appeal and a question of impartiality arose, the judge would recuse himself.

Appellants also argue that this Court lacked jurisdiction to issue the pen registers and the trap and trace devices for 551–6033 and 551–8197. The issuance of such devices, appellants claim, is within the exclusive province of the courts of common pleas. In support of their argument, they cite 18 Pa.C.S.A. §§ 5772 and 5773. Section 5772 provides that the Attorney General or other designated official may apply to the court of common pleas for authorization to install a pen register or trap and trace device. Section 5773 establishes the criteria necessary to grant orders authorizing pen registers and trap and trace devices. Despite these sections, we find that a Superior Court judge has the power to authorize pen registers and trap and trace devices when he or she approves a wiretap request. Nothing in the Wiretap Act prohibits a Superior Court judge from authorizing pen registers and trap and trace devices. Moreover, no purpose is furthered by requiring the applying official to obtain approval from both the court of common pleas and this Court. Because of the more intrusive nature of a wiretap, stricter grounds are required for authorizing a wiretap, than a pen register or trap and trace device. *Compare* 18 Pa.C.S.A. § 5710 and § 5773. Thus, an affidavit sufficient to obtain a wiretap will establish grounds for installing a pen register or trap and trace device.

Furthermore, we agree with the Commonwealth that pen registers and trap and trace devices were necessary to accomplish the ends for which the interception was sought. Section 5714 of the Wiretap Act requires that certain information be recorded during the electronic surveillance. The monitoring officer must record, *inter alia*, the participant, if known, in each intercepted conversation. Pursuant to § 5712(f), an order authorizing a wiretap may also direct that a provider of electronic communication service, *e.g.*, a telephone company, provide assistance necessary to accomplish an

interception. This may include subscriber information. Obtaining the telephone numbers of incoming and outgoing calls is needed before subscriber information can be sought. Therefore, the Commonwealth concludes, the issuing Superior Court judge had the power to authorize the installation of pen registers and trap and trace devices. *See* 42 Pa.C.S.A. § 323 ("Every court shall have power to issue ... every lawful writ and process necessary or suitable for the exercise of its jurisdiction and the enforcement of any order which it may make ...") and § 542 ("The Superior Court shall have all powers necessary or appropriate in aid of its jurisdiction ...").

For the reasons set forth above, we find that this Court had competent jurisdiction to authorize the wiretaps, pen registers, and trap and trace devices.[5] Therefore, the trial court properly denied the motion to suppress based upon the jurisdiction claim.

### B. Unauthorized surveillance of incoming calls

Appellants argue next that probable cause for the wiretaps was tainted. They assert that the pen registers placed on the Georgianna and Romano phone lines were used to unlawfully obtain information regarding incoming calls. The information obtained from the pen register on the Georgianna telephone was used to justify the application for the trap and trace device, which in turn were used for the wiretap application. All of the information obtained from the Georgianna phone line was then used to obtain a pen register on the Romano phone line. Subsequently, information from the Romano pen register was used to acquire a trap and trace device and a wiretap on that phone. Based on information from the Romano phone, the cellular phones used by Iannelli were tapped. Therefore, appellants conclude that the probable cause for all of the wiretaps was tainted. We disagree.

---

5. We acknowledge the existence of Internal Operating Procedure 65.51 which states that it shall be the policy of this Court "not to entertain applications for the installation and use of [p]en [r]egisters." We note, however, that this IOP was not enacted until April 1990, after the pen registers were issued in this case. Moreover, we do not find that a policy divests this Court of the power to authorize pen registers.

Appellants assert that the court order only authorized the use of a pen register as defined in the Wiretap Act.

A device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire communications, on the telephone line to which the device is attached.

18 Pa.C.S.A. § 5702. The device installed, however, was a dialed number recorder ["DNR"] which not only identifies the numbers dialed, but also measures the time, date and length of incoming calls.[6] Appellants' allege that such measurement violates the statutory authorization, per the definition of pen register, and the court order authorizing the pen registers.

■ First, we note that this Court has addressed the differences between a pen register and a DNR. We held that "the technical differences between a pen register and the DNRs used in this case are immaterial under the Act, as neither technically permits 'aural acquisition of the contents' of any communication." *Commonwealth v. Beauford,* 327 Pa.Super. 253, 259, 475 A.2d 783, 786 (1984) (quoting *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)). Based on our pronouncement in *Beauford,* we find that DNRs installed on the Georgianna and Romano telephones did not exceed statutory authorization.

■ We also find that the DNRs installed did not exceed court authorization.[7] As the Commonwealth notes, the application for the pen register on the Georgianna phone line used the terms pen register and DNR interchangeably. The application also requested that a device be installed on the Georgianna phone to record numbers dialed to and from the phone line. Moreover, the court order authorizing the pen register referred to numbers dialed to and from the Georgianna phone.

6. A DNR does not, however, identify the phone numbers of incoming calls.

7. Appellants contend that the DNRs installed on both the Georgianna and Romano phone lines exceeded the authorization of the court orders. Only the court order for the Georgianna pen register has been made a part of the record. Accordingly, our review will be limited to that order.

We acknowledge that in the first paragraph of the order, the trial court limited the description of the numbers to be recorded as outgoing numbers. In later paragraphs of the order, however, the trial court described the recorded numbers as those dialed to and from the Georgianna phone line. Therefore, we do not find that the installation of a DNR to record both outgoing numbers and the date and duration of incoming calls exceeded the court authorization. Thus, suppression was not required on this basis.

## C. Absence of probable cause

■ Appellants also complain that probable cause did not exist for the issuance of wiretaps on the two cellular phones, 551–6033 and 551–8197, because the information in the affidavits was stale. We disagree.

An application for an order authorizing interceptions of telephone communications must contain, *inter alia,* the identity of the person, if known, committing the offense under investigation and whose communications are to be intercepted. It must also contain details about particular offenses, the type of communications to be intercepted, and must show that there is probable cause to believe that pertinent communications will be transmitted on the facility under surveillance. The standard for determining whether probable cause existed is the same as that used to determine probable cause for search warrants. The facts contained in the affidavit for a search warrant must be such that an independent, issuing authority, exercising reasonable caution, can conclude that the items sought are connected with criminal activity and that they will be found in the place to be searched. Similarly, in an application for a wiretap, the Commonwealth must establish probable cause to believe that (1) a person has or is about to commit one of the offenses enumerated in the statute, (2) that communications relating to that offense will be transmitted, and (3) that such communications will be intercepted on the facility under surveillance. Our review of the application in the instant case persuades us unequivocally that the application con-

tained probable cause which was adequate to support the issuance of a wiretap order.

*Commonwealth v. Doty,* 345 Pa.Super. 374, 396–397, 498 A.2d 870, 881–882 (1985), *cert. denied,* 479 U.S. 853, 107 S.Ct. 185, 93 L.Ed.2d 119 (1986). *See also Commonwealth v. Reeves,* 378 Pa.Super. 29, 548 A.2d 260 (1988).

Appellants contend that probable cause for the wiretaps consisted of five telephone conversations, occurring on November 18 and 19, 1989. The affidavit of probable cause was dated December 6, 1989. Therefore, appellants conclude, the information was stale. After reviewing the affidavit for the wiretap applications for the two cellular phones, we are convinced that the orders were properly granted. The affiant, Trooper Teagarden, stated that the Romano wiretap revealed that Ralph Raymond Romano and at least sixteen others were conspiring to operate illegal lotteries and pool selling and bookmaking. Numerous conversations occurred between Romano and a man who the police suspected to be Robert Iannelli.[8] The affidavit also stated that Robert Iannelli was known to Pittsburgh law enforcement for his involvement in illegal gambling. It is true that the affidavit cited five gambling conversations between Iannelli and Romano on November 18 and 19.[9] These phone calls were placed by Iannelli from the two cellular phones for which the wiretaps were being requested. The affidavit, however, also referred to

8. One incident in particular supported the police's suspicion that the unidentified male who regularly talked to Romano, often about gambling, was Robert Iannelli. During a conversation occurring on November 24, 1989, the two men discussed that Donna had a baby. The next day, the affiant contacted Magee Women's Hospital and discovered that Donna Iannelli had been admitted and had given birth. During another conversation, the man gave Romano directions to Magee Hospital. Finally, during the evening of November 26th, physical surveillance placed Robert Iannelli at Magee.

   For purposes of this section, we will now presume that the unidentified man was Iannelli as the police suspected and later confirmed. Therefore, we will refer to the caller as Iannelli.

9. During one of these conversations, Iannelli stated two numbers to Romano which Romano repeated. The affiant later learned that those were the two winning numbers in the official Ohio lottery for November 18th.

three other gambling conversations between the two men, occurring on November 20, 24 and 27.[10] Finally, the affidavit stated that Romano would often call a voice pager number, activate the pager, and repeat, "Scooter, Scooter, Scooter." Shortly after this, Iannelli would call Romano. The affiant stated that this pattern was similar to phone calls between Georgianna and Romano, both of which were consistent with interaction between higher and lower level bookmakers. The affiant averred, as he had in the Romano application, that he suspected these people were involved in an illegal gambling organization. Trooper Teagarden also suspected that Robert Iannelli was at the top of the organization. The Romano wiretap application and accompanying documentation was attached to and incorporated into the applications for the cellular phones because of the large organizational nature of the suspected criminal activity.

Reviewing this evidence and the continuing nature of the crimes suspected under the "the totality of the circumstances" standard, *see Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985), we find that the affidavit proved probable cause to issue the wiretap.

### D. Constitutionality of the Wiretap Act

█ Finally, appellants allege that the Wiretapping and Electronic Surveillance Act, 18 Pa.C.S.A. § 5701, *et seq.*, is unconstitutional. The constitutionality of the Wiretap Act was squarely addressed by this Court in *Commonwealth v. Doty, supra.* Appellants acknowledge this case, but urge that it should be reexamined in light of *Commonwealth v. Hashem*, 526 Pa. 199, 584 A.2d 1378 (1991) and *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). Nothing in our review of these cases leads us to believe that *Doty* has been affected or should be reexamined; the Wiretap Act is constitutional. Accordingly, the trial court properly denied the motion to suppress on this basis.

10. These phone calls were either not made from the cellular phones or were made from phones which were not identified. Nonetheless, the substance of the conversations reveals the continuing nature of the crimes in which Iannelli and Romano were engaged.

420

## II. UNCONSTITUTIONAL OVERBREADTH OF SEARCH WARRANTS

Iannelli asserts that the search warrants executed on January 27, 1990 were unconstitutionally overbroad.[11, 12] Specifically, Iannelli argues that the underlined passage in the following description of the items to be seized was too vague:

> Sports wagers, lottery wagers, lay off wagers, master tally sheets, records, the accepting of wagers over the telephone. All other paraphernalia dealing with illegal gambling operation to include: (telephones, tape recorders, calculators, fax machines, computors [sic] and disc, and all other devices to facilitate a betting operation). Also U.S. currency connected with said illegal betting operation. Photos of the persons and/or premises searched and any document(s) relating to proof of residency and/or premises ownership, *also all books, papers, records, recordings, tapes, memorandum, written communications, corporate records and/or indicia of ownership or control [of] any business enterprise including but not limited to Brandt Oldsmobile.*

Warrant G 13459 issued for search of Dorchester Apartment # 405.[13] Iannelli argues that, "A warrant authorizing the seizure, of '**all**' records related to '**any** business enterprise' is unconstitutionally overbroad." Appellant's brief at 24 (emphasis in original). His argument is premised on our Supreme Court's holding in *Commonwealth v. Grossman*, 521 Pa. 290,

11. It appears that Iannelli challenges the constitutionality. of all the warrants executed. The Commonwealth correctly notes, however, that he only has standing to challenge the warrant issued for his home, 315 Thompson Run Road, the Dorchester Apartment, and 315 Kingsberry Circle. *See Commonwealth v. Patterson,* 392 Pa.Super. 331, 572 A.2d 1258, *alloc. denied,* 527 Pa. 631, 592 A.2d 1299 (1991) and footnote 17. Therefore, our review will be limited to the warrants for those locations.

12. Although Rodney joins in this argument, he only has standing to challenge the search of 315 Thompson Run Road. *See Commonwealth v. Patterson, supra.*

13. The search warrant for 315 Thompson Run Road is virtually identical to the above quoted warrant.

555 A.2d 896 (1989). We find the two cases distinguishable and the warrant constitutional.

We are mindful that:

The framers of the Pennsylvania Constitution thought the right to be free from unrestricted police intrusions so critical that they secured the right for future generations by including it in the original Constitution of 1776. The language of the Pennsylvania Constitution requires that a warrant describe "as nearly as may be. . . ." The clear meaning of the language is that a warrant must describe the items as specifically as is reasonably possible. This requirement is more stringent than that of the Fourth Amendment, which merely requires particularity in the description. The Pennsylvania Constitution further requires the description to be as particular as is reasonably possible. *See Commonwealth v. Reese*, 520 Pa. 29, 31, 549 A.2d 909, 910 (1988) (Nix, C.J., dissenting) (Pennsylvania particularity requirement more stringent than that of the Fourth Amendment because Pennsylvania particularity requirement precedes probable cause requirement).

It is settled Fourth Amendment jurisprudence that a warrant must specifically list the things to be seized. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The more rigorous Pennsylvania Constitution requires no less.

*Id.* 521 Pa. at 296, 555 A.2d at 899 (footnote and citations omitted).

In *Grossman*, appellant was an owner of a local insurance agency with a clientele of more than 2,000 active cases. Three of Grossman's clients had complained to the Pennsylvania Insurance Commission because Grossman had apparently been applying partial or full premiums paid on new or renewal policies to meet third party obligations. Based on an affidavit

detailing the complaints lodged with the Commission, police obtained a search warrant for Grossman's office. The items to be seized were described as "[a]ll insurance files, payment records, receipt records, copies of insurance applications and policies, [and] cancelled checks." *Id.* at 292, 555 A.2d at 897. Given this description, the police literally seized every file in the office.

The *Grossman* Court held that the warrant did not withstand constitutional scrutiny. In performing its analysis, our Supreme Court stated,

> in any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. An unreasonable discrepancy reveals that the description was not as specific as was reasonably possible.

*Id.* at 296, 555 A.2d at 900. When it reviewed the affidavit of probable cause, the Court found that irregularities in only three client files were discussed. Despite the limits of the affidavit, the warrant description of items to be seized included *all* insurance files, etc. Accordingly, the Supreme Court held the warrant to be unconstitutional. *Id.*

This case is distinguishable from *Grossman.* Here, the affidavit of probable cause did not merely discuss three instances of illegal conduct. Rather, the affidavit stated that the court-authorized wire interception of the cellular phones revealed that Iannelli accepted approximately $500,000 in sports wagers and/or layoffs that were wagered on professional and collegiate football teams and another $55,000 in "number wagers and/or layoffs that were wagered on the outcome of the Pennsylvania and Ohio lottery daily number, old and new stock number results, and the horse race results." Affidavit of probable cause, at 3–4. Through the wiretap, the police had determined that at least thirteen other people were involved in the illegal number and sports-betting operation. The affidavit further summarized recorded conversations regarding "sports and numbers wagers and/or layoffs; line

information and settle-up figures, and meetings and information pertinent to a sports and numbers betting operation." *Id.* at 4. Finally, the affidavit summarized the police's physical surveillance of suspected members of the operation.

This information established probable cause to believe, as charged in the warrant, that Iannelli was at the top of a corrupt organization. Under the Corrupt Organizations Act, it is unlawful for any person who has received money from a pattern of racketeering activity[14] to use any part of that money to acquire any interest in or establish an enterprise. Iannelli acknowledges that "any business enterprise" referred to the corrupt organizations charge.[15] He asserts, however, that the affidavit did not establish that Iannelli was receiving income from a pattern of racketeering activity or identify an "enterprise" in which he acquired an interest by use of racketeering income. We disagree.

In the affidavit, the police explicitly detailed the gambling operations which they had discovered through electronic and physical surveillance. In less than two months, Iannelli and the lower level bookies had exchanged over $500,000. Thus, the affidavit established that Iannelli was receiving income from a pattern of racketeering activity. It also supported the investigators' belief that Iannelli was heading an organization that was formed for the purpose of engaging in the commerce of running illegal lotteries and bookmaking operations. As the Commonwealth argues, an enterprise can be a wholly illegal entity. *Commonwealth v. Yacoubian,* 339 Pa.Super. 413, 489 A.2d 228 (1985). In *Yacoubian,* we stated, that the Corrupt Organizations Act "enables law enforcement to reach the criminal enterprise which has no legitimate dimension or has yet to achieve one." *Id.* at 420, 489 A.2d at 231. Because

14. Our Legislature defines racketeering activity as "any act which is indictable under ..." 18 Pa.C.S.A. §§ 5512 through 5514 (relating to gambling). 18 Pa.C.S.A. § 911(h)(1). A pattern of racketeering is simply two or more acts of racketeering activity. 18 Pa.C.S.A. § 911(h)(4).

15. An enterprise is any person, legal entity or any group of people "associated in fact although not a legal entity" engaged in commerce. 18 Pa.C.S.A. § 911(h)(3).

the affidavit provided probable cause to believe that a corrupt organization had been formed, the warrant's authorization to search for all records of such an organization was not over-broad.

Iannelli, however, contends that no statement of probable cause would justify a grant of authority to search for and seize all business records. We believe that the nature of organized crime is such that broad searches are required to undercover the activity. The Third Circuit Court of Appeals discussed this issue in *U.S. v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087 (3 Cir.1989), *cert. denied*, 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989) and 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 741 (1990). There, appellants, brokers and dealers in securities, were engaged in a money-laundering scheme, violating 31 U.S.C. §§ 5313(a) and 5322. They claimed, *inter alia*, that the warrant issued for the search of their premises was overbroad. The affidavit of probable cause described parts of American Investors' corporate records which showed failure to file currency transaction reports. The warrant, however, granted authority to search records other than those described in the warrant and included "a general tail directing the search and seizure of other documents and items which are fruits, and instrumentalities and evidence of the alleged violations." *Id.* at 1104. Reversing the district court, the Third Circuit found that the warrant was not overbroad. It stated,

> The fact that the warrant authorized a search for a large amount of documents and records does not necessarily render the search invalid so long as there exists a sufficient nexus between the evidence to be seized and the alleged offenses. Given the complex nature of a money-laundering enterprise, we cannot say that the categories overdescribed the extent of the evidence to be seized.

> \*    \*    \*    \*    \*    \*

> Here, given the range of information required to unravel the laundering scheme and the extent of participation by the parties, the warrant was as specific as circumstances would

allow, however broad the requirements of the search might be.

*Id.* at 1105–1106.

Similarly, the information required to uncover organized crime is quite extensive. We fail to see how the warrant could have been more specific given the circumstances of the suspected activity. Accordingly, we find that the warrant was not overbroad.[16]

## III. ABSENCE OF PROBABLE CAUSE FOR THREE SEARCH WARRANTS

Next, Iannelli contends that the affidavit did not establish probable cause to believe that the evidence sought would be found at 315 Thompson Run Road, 315 Kingsberry Circle or the Dorchester Apartment.[17]

### A. 315 Thompson Run Road

Iannelli argues that no probable cause was established to believe that the Thompson Run house would contain the evidence sought because: (1) the police did not state specific facts to support that 315 Thompson Run Road was his residence, and (2) the only connection between him and the house was the averment that it was his residence. With respect to his first contention, we note that in the affidavit, the police stated that through electronic, photographic and physical surveillance, they had determined that Robert Iannelli resided at 315 Thompson Run Road and was heading illegal gambling operations. We deem the police officer's averments to be a sufficient basis upon which the issuing magistrate could have relied to find that 315 Thompson Run Road was Iannelli's residence.

16. Even if the warrant was unconstitutionally overbroad, we find that admitting the evidence seized was harmless error. *See* discussion, *infra.*

17. Again, we note that although Rodney has joined in this argument too, he only has standing to challenge the Thompson Run Road house, his residence. *See Patterson, supra.*

As for Iannelli's second argument, this Court addressed these same arguments in *Commonwealth v. Gannon*, 308 Pa.Super. 330, 454 A.2d 561 (1982). In that case, a search warrant was also issued for appellant's home. The affidavit of probable cause included reports by Lillian Tonden ["Tonden"] that her bank account had been depleted by more than $30,000 and that more than $50,000 of stocks had been redeemed by her granddaughter without her consent. Tonden had placed her granddaughter's name on her checking and savings account so that the granddaughter could assist her grandmother with her banking. Based upon these allegations, a search warrant was issued for the granddaughter's home. The items to be seized were copies of bank records, statements, cancelled checks, etc. We held that the affidavit supported probable cause because

it is only a matter of common sense to assume that the most likely place to find the bank records would be in Mrs. Gannon's residence. "[T]he law does not require that the information in a warrant affidavit establish with absolute certainty that the object of the search will be found at the stated location, nor does it demand that the affidavit information preclude all possibility that the sought after article is not secreted in another location."

*Id.* at 336, 454 A.2d at 564 (quoting *Commonwealth v. Forster*, 253 Pa.Super. 433, 437–438, 385 A.2d 416, 418 (1978)).

Similarly, we find that it was a matter of common sense that the most likely place to find the physical evidence of gambling would be at Iannelli's home. Accordingly, we find that the affidavit provided probable cause to support the issuance of the search warrant.

Moreover, we find that even if the evidence obtained from the Thompson Run Road residence was improperly admitted, it was harmless error. As our Supreme Court as stated,

evidence improperly admitted can be treated as harmless on any one of three grounds, namely, that the evidence of guilt, without regard to the tainted evidence, is so overwhelming

that conviction would have followed beyond a reasonable doubt without regard to it, that the tainted evidence was merely cumulative of other proper persuasive evidence on the issue for which it is offered, or that it was so slight or tangential in its effect that its influence on the jury can be determined to have been *de minimis.*

*Commonwealth v. Norris,* 498 Pa. 308, 317, 446 A.2d 246, 250 (1982).

Here, we find that the evidence of guilt was so overwhelming that Iannelli would have been convicted beyond a reasonable doubt without the evidence from the Thompson Run Road address. The tape recordings from the electronic surveillance of the various telephones provided a sufficient basis upon which to convict Iannelli and his co-conspirators. Moreover, many people who were involved in the gambling ring testified at length as to their dealings with Iannelli.

Our review of the evidence seized also reveals that it concerned the corrupt organizations offense of which Iannelli was acquitted. The items seized did not relate to the gambling charges. Accordingly, we also find that the effect of the evidence on the factfinder was *de minimis.*

## B. Dorchester Apartments

Next, Iannelli contends that the affidavit did not provide probable cause to believe that the items sought would be found at the Dorchester Apartment. We agree. At trial, the Commonwealth proved that Iannelli rented Apartment 405 at 3 Dorchester Drive, Bethel Park, PA in the name of John Russo. This was not established in the affidavit, however. In fact, the affidavit merely placed Iannelli at the apartment twice and noted that one call was placed from one of the cellular phones to the Dorchester apartment. This is not a sufficient basis to infer that Iannelli resided at this apartment as well as his Thompson Run Road residence. Therefore, we cannot find that the affidavit supported probable cause to search the apartment under *Gannon, supra.* Accordingly, the magistrate improperly issued the warrant and the evidence should have been suppressed.

■ Nonetheless, the admission of the evidence was harmless error. As we noted above, the evidence was so overwhelming that Iannelli would have been found guilty beyond a reasonable doubt without it.

### C. 315 Kingsberry Circle

■ Finally, Iannelli challenges the warrant for 315 Kingsberry Circle. The affidavit described a conversation between Iannelli and Tom Handyside in which Iannelli stated that he had left money for various expenses at 315 Kingsberry Circle. The affiant stated that he believed Tom to be the brother of Catherine Handyside of 315 Kingsberry Circle. Additionally, physical surveillance placed Iannelli at the Kingsberry residence on January 17 and 19, 1990. Based upon this information, the affiant concluded that Iannelli was utilizing the Handyside residence for gambling activities, paying the family for various expenses incurred.[18]

We find that this information established probable cause to believe that evidence of the illegal gambling would be found at the Kingsberry apartment.

## IV. TAINTED SEARCH WARRANT FOR THOMPSON RUN ROAD GARAGE

On January 31, 1990, the police requested an additional search warrant for the garage of the Thompson Run Road residence. The items to be seized were papers, receipts, ledgers and documents which the police saw in a cupboard in the garage when they executed the search of the residence. In the search of the residence, business records for an estab-

18. The Commonwealth asserts that Iannelli does not have standing to challenge the warrant issued for 315 Kingsberry Circle because "[h]e claims no possessory or proprietary interest in the apartment and was not present at the time of the search." Appellee's brief at 43 (citing *Commonwealth v. Patterson, supra.*). As Iannelli notes, however, the Commonwealth failed to raise this issue below. Moreover, we find it anomalous that probable cause to support the warrant can only be found by inferring that Iannelli did have a proprietary interest in 315 Kingsberry Circle and yet the Commonwealth argues that Iannelli lacks standing. Thus, we will entertain Iannelli's challenge to the warrant.

lishment known as "Chubb's Place" were seized. Because the ledger exceeded the register receipts by approximately $100 daily, the police suspected a money laundering scheme was taking place. Therefore, they wanted to obtain the documents from the garage. Iannelli argues that this search was tainted by the prior illegality of the search of the Thompson Road Residence. Because we found the prior search to be legal, we do not find any taint in the search of the garage.

## V.  INSUFFICIENCY OF EVIDENCE

Iannelli also challenges the sufficiency of the evidence to support twenty of the twenty-four gambling counts with which he was charged. The standard applied in reviewing a sufficiency claim is well-settled:

We must determine whether, viewing all the evidence at trial, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth, the jury could have found that each element of the offense was proven beyond a reasonable doubt. Both direct and circumstantial evidence can be considered equally when assessing the sufficiency of the evidence.

*Commonwealth v. French*, 396 Pa.Super. 436, 440, 578 A.2d 1292, 1294 (1990), *aff'd*, 531 Pa. 42, 611 A.2d 175 (1992); *see also Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663 (1992).

Specifically, Iannelli contends that the Commonwealth failed to introduce evidence supporting the bookmaking and lottery charges for certain periods of time.[19] The evidence in the more than 1,000 pages of notes of testimony supports the

---

**19.** Iannelli was charged with twelve counts of illegal lotteries, 18 Pa.C.S.A. § 5512, and twelve counts of bookmaking, 18 Pa.C.S.A. § 5514. As indicated below, each lotteries count covered a specific time period, with a corresponding bookmaking count for each period:

| Pool selling | Lotteries | Dates | | |
|---|---|---|---|---|
| Count 3 | Count 15 | 1/86 | – | 11/15/89 |
| Count 5 | Count 16 | 11/16/89 | – | 11/22/89 |
| Count 6 | Count 17 | 11/23/89 | – | 11/29/89 |
| Count 7 | Count 18 | 11/30/89 | – | 12/6/89 |
| Count 8 | Count 19 | 12/7/89 | – | 12/13/89 |
| Count 9 | Count 20 | 12/14/89 | – | 12/20/89 |
| Count 10 | Count 21 | 12/21/89 | – | 12/27/89 |

guilty convictions. Tape recordings of Iannelli's phone conversations proved his involvement in illegal gambling for the periods charged. Moreover, many bookmakers testified about their involvement with Iannelli in his gambling operations. Further, as the Commonwealth notes, Iannelli is criminally responsible for the acts of his co-conspirators. *Commonwealth v. Bigelow*, 416 Pa.Super. 449, 611 A.2d 301 (1992). A plethora of testimony was introduced as to Iannelli's co-conspirators' gambling activities during the times in question, as well. Therefore, we find no merit in Iannelli's insufficiency argument.

## VI. IMPROPER ADMISSION OF MONITORS' LOGS

Iannelli's final claim is that the monitors' logs of the electronically intercepted telephone conversations were improperly admitted into evidence.[20] The gist of his argument, however, is that if the logs are used to determine the substance of the recorded conversations, they constitute double hearsay. Particularly, Iannelli expresses concern that the Commonwealth might have used them to "paper over the failure of proof on the counts discussed in the immediately preceding section of this Argument." Iannelli's brief at 35–36. First, we note that our review of the record shows that the actual tapes, not the logs, were used to determine the substance of the conversations. Second, our finding that the evidence was sufficient to support guilty verdicts for the twenty counts challenged by Iannelli is in no way based upon the substance of the monitors' logs. Therefore, we find no merit in Iannelli's final argument.

Judgments of sentence affirmed.

McEWEN, J., filed a dissenting statement.

| Pool selling | Lotteries | Dates | | |
|---|---|---|---|---|
| Count 11 | Count 22 | 12/28/89 | – | 1/3/90 |
| Count 12 | Count 23 | 1/4/90 | – | 1/10/90 |
| Count 13 | Count 24 | 1/11/90 | – | 1/17/90 |
| Count 14 | Count 25 | 1/18/90 | – | 1/24/90 |
| Count 15 | Count 26 | 1/25/90 | – | 5/31/90 |

**20.** Iannelli concedes that they were properly admitted as records of the dates and times of intercepted conversations.

McEWEN, Judge, dissenting.

The author of the majority opinion has provided a perceptive and persuasive expression of position, but I am obliged to differ somewhat with that view. I do concur in the result of Section I(A) of the majority opinion, since I believe that this Court is possessed of original jurisdiction to issue orders authorizing the interception of wire and electronic communications. I am constrained, however, to dissent from the holding of the majority on the issue of the constitutionality of the search warrants executed on January 27, 1990, because I would find that the warrants, authorizing the seizure of "all books, papers, records, recordings, tapes, memorandum, written communications, corporate records and/or indicia of ownership or control [of] any business enterprise ...", were unconstitutionally overbroad under Pennsylvania law.

> The use of a search warrant as a general investigatory tool is prohibited by both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. "A search warrant serves to authorize the seizure of identifiable and existing property. *It is not available as a general investigatory tool to be used in place of a grand jury.*" *In re Casale,* 512 Pa. 548, 555, 517 A.2d 1260, 1263 (1986). "[M]ere suspicions do not constitute probable cause to support a search warrant." *Commonwealth v. Smith,* 511 Pa. 36, 47, 511 A.2d 796, 801 (1986), *cert. denied,* 479 U.S. 1006, 107 S.Ct. 643, 93 L.Ed.2d 700 (1986). *See also: Commonwealth v. Corleto,* 328 Pa.Super. 522, 528–529, 477 A.2d 863, 866 (1984); *Commonwealth v. Kanouff,* 315 Pa.Super. 392, 394–395, 462 A.2d 251, 252 (1983).

*Commonwealth v. Bagley,* 408 Pa.Super. 188, 197–198, 596 A.2d 811, 815 (1991) (emphasis added), *allo. denied,* 531 Pa. 637, 611 A.2d 710 (1992), and *cert. denied,* —— U.S. ——, 113 S.Ct. 606, 121 L.Ed.2d 541 (1992). In the instant case, while the investigating officers may have suspected that the defendants were utilizing business entities other than Brandt Oldsmobile in order to invest and launder proceeds from gambling activities, there was no reference of any kind whatsoever in

the affidavit of probable cause to the use or investment of proceeds from the gambling activities in any such enterprise or business.

"It is a fundamental rule of law that a warrant must name or describe with particularity the property to be seized and the person or place to be searched.... In addition, the search may not go beyond the scope of the warrant." *Commonwealth v. Eichelberger,* 352 Pa.Super. 507, 513, 508 A.2d 589, 592 (1986), *citing* Pennsylvania Constitution, Article I, Section 8; Pa.R.Crim.P. 2005(b) and (c); and *Commonwealth v. Searles,* 450 Pa. 384, 302 A.2d 335 (1973). *See also: Commonwealth v. Reese,* 520 Pa. 29, 32, 549 A.2d 909, 910 (1988), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990); *Commonwealth v. Bleigh,* 402 Pa.Super. 169, 174–176, 586 A.2d 450, 453 (1991).

The particularity requirement prohibits a warrant that is not particular enough and a warrant that is overbroad. These are two separate, though related, issues. A warrant unconstitutional for its lack of particularity authorizes a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize. This will result in general "rummaging" banned by the fourth amendment. *See Marron v. United States,* 275 U.S. 192, 195, 48 S.Ct. 74, 75, 72 L.Ed. 231 (1927). *A warrant unconstitutional for its overbreadth authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation.* The officers executing such a warrant will not rummage, but will "cart away all documents." *Application of Lafayette Academy,* 610 F.2d 1, 3 (1st Cir.1979). An overbroad warrant is unconstitutional because it authorizes a general search and seizure.

*Commonwealth v. Santner,* 308 Pa.Super. 67, 69–70 n. 2, 454 A.2d 24, 25 n. 2 (1982), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984). In interpreting the particularity requirement set forth in Article I, Section 8 of the Pennsylvania Constitution, the Supreme Court has said:

The language of the Pennsylvania Constitution requires that a warrant describe the items to be seized "as nearly as may be...." The clear meaning of the language is that a warrant must describe the items as specifically as is reasonably possible. This requirement is more stringent than that of the Fourth Amendment, which merely requires particularity in the description. *The Pennsylvania Constitution further requires the description to be as particular as is reasonably possible. See Commonwealth v. Reese,* 520 Pa. 29, 31–32, 549 A.2d 909, 910 (1988) (Nix, C.J., dissenting) (Pennsylvania particularity requirement more stringent than that of the Fourth Amendment because Pennsylvania particularity requirement precedes probable cause requirement).

It is settled Fourth Amendment jurisprudence that a warrant must specifically list the things to be seized. *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The more rigorous Pennsylvania constitutional provision requires no less.

Although some courts have treated overbreadth and ambiguity as distinct defects in warrants, *e.g. Commonwealth v. Santner,* 308 Pa.Super. 67, 68 n. 2, 454 A.2d 24, 25 n. 2 (1982), both doctrines diagnose symptoms of the same disease: a warrant whose description does not describe as nearly as may be those items for which there is probable cause. Consequently, in any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. *The sufficiency of the description must then be measured against those items for which there was*

*probable cause.* Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. An unreasonable discrepancy reveals that the description was not as specific as was reasonably possible.

*Commonwealth v. Grossman,* 521 Pa. 290, 296–297, 555 A.2d 896, 899–900 (1989) (footnote omitted).

*Commonwealth v. Bagley,* supra 408 Pa.Super. at 195–197, 596 A.2d at 814–815 (emphasis added). *Accord: Commonwealth v. Friedman,* 411 Pa.Super. 628, 602 A.2d 371, 379–380 (1992), *allo. denied,* 532 Pa. 650, 615 A.2d 340 (1992).

The affidavit of probable cause submitted by Officer Teagarden in support of the application for the search warrants concluded with a request for the issuance of search warrants for "the above described items and/or premises and/or person described in the instant warrant". However, as counsel for appellants recounted in a compelling presentation, the affidavit never mentioned, much less described, any businesses or bank accounts utilized by any of the co-conspirators other than Brandt Oldsmobile.[1] The affidavit contained no information whatsoever concerning the existence of profits derived from the gambling activities or the investment or utilization of *any* such profits or proceeds. The authorizations, in the search warrants themselves, are similarly deficient since there are no references to money-laundering activities and yet the executing officers are directed to seize the records of *any* business enterprise pursuant to the command to seize "all books, papers, records, recordings, tapes, memorandum, written communications, corporate records and/or indicia of ownership or control [of] *any business enterprise* including but not limited to Brandt Oldsmobile". (Emphasis added). Thus, the warrant was, in my view, fatally defective. *See e.g., U.S. v. Holzman,* 871 F.2d 1496, 1509 (9th Cir.1989); *U.S. v. LeBron,*

---

1. The affidavit noted only that the late model maroon Oldsmobile operated by Robert Iannelli was registered to Brandt Oldsmobile, and that two calls to Brandt Oldsmobile, regarding the scheduling of a meeting at Brandt Oldsmobile, had been intercepted via the court-authorized wiretap.

729 F.2d 533, 536–537 (8th Cir.1984); *Commonwealth v. Bagley, supra,* 408 Pa.Super. 188, 596 A.2d 811; *Commonwealth v. Grossman, supra,* 521 Pa. 290, 555 A.2d 896.

The Commonwealth argues that, even if the warrant was defective, admission into evidence of the materials produced by the warrants was harmless error and did not compose such error as to require a new trial. Appellate consideration of this contention requires the application of the *Story* test:

> [A]n error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.

*Commonwealth v. Story,* 476 Pa. 391, 412, 383 A.2d 155, 166 (1978). *See also: Commonwealth v. Correa,* 423 Pa.Super. 57, 70 n. 9, 620 A.2d 497, 504 n. 9 (1993); *Commonwealth v. Foy,* 531 Pa. 322, 325, 612 A.2d 1349, 1352 (1992); *Commonwealth v. Moore,* 389 Pa.Super. 473, 480, 567 A.2d 701, 705 (1989), *allo. denied,* 525 Pa. 597, 575 A.2d 563 (1990). My examination of the record precludes a determination that the error could not have contributed to the verdict. Thus, I would reverse the judgment of sentence and remand for a new trial.