J-A13014-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                              :  PENNSYLVANIA
                                                              :

v.                                          :

RUBEN MORALES                     :

          Appellant        :  No. 2631 EDA 2019

Appeal from the Judgment of Sentence Entered August 20, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0006582-2014

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:        **FILED AUGUST 19, 2020**

Appellant, Ruben Morales, appeals from the judgment of sentence of an aggregate term of 2-5 years' imprisonment, followed by five years' probation, imposed after the trial court found him guilty of, *inter alia*, corrupt organizations and possession of marijuana with intent to deliver.  We affirm.

The trial court summarized the factual and procedural background of this case as follows:

> [Appellant] participated in a corrupt organization that distributed marijuana in and around Montgomery County, Pennsylvania. After the Commonwealth charged him with more than a dozen offenses, he filed a pretrial motion seeking to suppress, *inter alia*, evidence seized from 2051 Carlisle Street and 1537 Fontain Street, both in Philadelphia, Pennsylvania.  [Appellant] asserted the search warrants for those two locations were not supported by affidavits that provided sufficient probable cause.  This court declined to suppress the evidence after a hearing and subsequently found [Appellant] guilty at a bench trial of one count

_____

[*] Retired Senior Judge assigned to the Superior Court.

of corrupt organizations,[2] two counts of possession of marijuana with intent to deliver,[3] one count of criminal conspiracy,[4] two counts of dealing in proceeds of unlawful activity,[5] three counts of criminal use of a communication facility,[6] four counts of possession of a controlled substance[,][7] and one count of drug paraphernalia.[8] He received an aggregate sentence of two to five years in prison, plus five years of consecutive probation.

> [2] 18 Pa.C.S. § 911(b)(1).
>
> [3] 35 Pa.C.S. § 780-113(a)(30).
>
> [4] 18 Pa.C.S. § 903(a)(1).
>
> [5] 18 Pa.C.S. § 5111(a)(1).
>
> [6] 18 Pa.C.S. § 7512(a).
>
> [7] 35 Pa.C.S. § 780-113(a)(16).
>
> [8] 35 Pa.C.S. § 780-113(a)(32).

[Appellant] did not file a post-sentence motion. He filed a notice of appeal to the Pennsylvania Superior Court and later produced a concise statement of errors in accordance with Pa.R.A.P. 1925(b). [T]he Superior Court dismissed the appeal without prejudice and remanded the case for resentencing.[1] This court

---

[1] With respect to this case's procedural history, the trial court further explained that:

> [Appellant] previously filed a direct appeal from his original judgment of sentence. **Commonwealth v. Morales**, 1805 EDA 2018, *notice of appeal docketed* (Pa. Super. June 27, 2018). He produced a Pa.R.A.P. 1[9]25(b) concise statement[,] and this court authored a Rule 1925(a) Opinion and forwarded the record to the Superior Court. Upon defense request, the Superior Court dismissed the appeal without prejudice, remanded the case back to this court for resentencing[,] and relinquished jurisdiction. **Id.**, *Order* (June 27, 2019). This court subsequently executed an agreed[-upon] Order modifying the original sentence to make [Appellant] eligible [under] the Recidivism Risk Reduction Incentive [Act, 61 Pa.C.S. §§ 4501-4512]. [Appellant] has now filed an appeal from his judgment of sentence, as modified. Under the circumstances, this court did not intend to order [Appellant]

issued an Order dated August 20, 2019, modifying [Appellant's] sentence. He has timely appealed again.

TCO at 1-3 (footnote omitted).

Presently, Appellant raises the following issues for our review:

1. Did the lower court err in denying … Appellant's pretrial motion to suppress evidence where the search warrants for the two locations in this case did not establish probable cause that there was a sufficient nexus between the contraband that was supposed to be seized and these locations?

2. Was the evidence insufficient to prove that … Appellant was guilty of any of the charges for which he was convicted where his constructive possession of the controlled substances was not proven beyond a reasonable doubt?

Appellant's Brief at 3.

## I.

In Appellant's first issue, he argues that the trial court "erred in denying [his] pretrial motion to suppress evidence where the search warrants for the two locations in this case did not establish a sufficient nexus between contraband and those locations." *Id.* at 8 (unnecessary capitalization and emphasis omitted). He submits that "a fair and objective review of the search warrant Affidavits of Probable Cause in this case will persuade this Court that

_____

to file a new concise statement of errors. He, nevertheless, submitted a concise statement that is almost identical to the one previously filed, except it appears to seek to remedy a lack of specificity with regard to issue two that this court noted in its original opinion.

Trial Court Opinion (TCO), 10/22/19, at 1 n.1.

- 3 -

the issuing authority did not have a substantial basis for concluding that probable cause existed to search these two residences." ***Id.***

At the outset, we acknowledge our scope and standard of review for such claims. This Court has explained:

> [O]ur scope and standard of review of an order denying a motion to suppress are unique when we are reviewing a magistrate's decision to issue a search warrant. They differ from those cases in which we are reviewing a court's decision regarding evidence obtained without a warrant. When reviewing a magistrate's decision to issue a warrant, there are no factual findings from the trial court. Thus, we need not consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Instead, we are merely reviewing the magistrate's decision to issue the warrant. As such, our duty is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.
>
> ***
>
> The legal principles applicable to a review of the sufficiency of probable cause affidavits are well settled. Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a "totality of the circumstances" test as set forth in ***Illinois v. Gates***, 462 U.S. 213 … (1983), and adopted in ***Commonwealth v. Gray***, … 503 A.2d 921 ([Pa.] 1985). A magistrate is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, … there is a fair probability that contraband or evidence of a crime will be found in a particular place. The information offered to establish probable cause must be viewed in a common sense, nontechnical manner. Probable cause is based on a finding of the probability, not a *prima facie*

> showing of criminal activity, and deference is to be accorded a magistrate's finding of probable cause.
>
> Probable cause does not demand the certainty we associate with formal trials. Rather, a determination of probable cause requires only that the totality of the circumstances demonstrates a fair probability that contraband or evidence of a crime will be found in a particular place.

*Commonwealth v. Manuel*, 194 A.3d 1076, 1080-82 (Pa. Super. 2018) (internal citations, footnote, and quotation marks omitted). *See also Commonwealth v. Huntington*, 924 A.2d 1252, 1258 (Pa. Super. 2007) ("The application for the search warrant must be evaluated from the perspective of the issuing magistrate and whether it provides sufficient information, within the four corners of the affidavit, to support the conclusion that probable cause exists to believe that contraband or evidence of a crime will be found in a particular place.") (citation omitted).

Here, the affidavits of probable cause outline the investigation of a drug-trafficking organization operated by Jason Marks, Gregory Gaudreau, Michael Lynch, Larry Kline, Appellant, and others. *See* Commonwealth's Exhibit 1 at 3 (Carlisle Affidavit).[2] Because the affidavits are lengthy, spanning over 180 pages, we attempt to summarize briefly the most pertinent information set forth in them.

---

[2] Because the affidavits of probable cause for the Fontain Street and Carlisle Street locations are substantially similar, we primarily cite to the Carlisle Street affidavit. *See also* TCO at 5 n.10 ("The affidavits of probable cause are substantially the same...."); Appellant's Brief at 10 (not making any distinction between the affidavits); Commonwealth's Brief at 8 (noting that the facts set forth in the affidavits are "essentially identical to each other").

The drug operation conducted by Marks, Lynch, and Gaudreau was reported to police by ten confidential informants, a concerned citizen, and several unwitting informants. *Id.* at 7. Collectively, these sources revealed that Marks, Lynch, and Gaudreau procured large quantities of marijuana from California, transported the marijuana to Pennsylvania, and sold it to drug dealers. *Id.* at 8.

Between July 7, 2013 and January 11, 2014, Appellant's phone number had 203 telephone contacts with a phone number used by Marks. *Id.* at 64-65. Between August 14, 2013 and January 3, 2014, Appellant's phone number had 32 telephone contacts with a phone number attributed to Kline, a drug supplier in California. *See id.* at 38, 64-65. Between the dates of July 20, 2013 and January 2, 2014, Appellant's phone number had 59 telephone contacts with a phone number identified as belonging to Adam Karloff. *Id.* at 66.[3]

Police conducted controlled purchases and surveillance on members of the drug-trafficking organization, details of which are set forth in the

---

[3] With respect to Karloff, the affidavit details that the Pennsylvania Office of Attorney General, Organized Crime Section, and the United States Department of Homeland Security, completed an investigation into a marijuana drug trafficking organization operating within the Pennsylvania counties of Montgomery and Berks in 2007, which revealed involvement by Marks and Appellant in the sale of pounds of high-grade marijuana, though they were not indicted in the case. *Id.* at 17. Instead, law enforcement "targeted the hierarchy of the organization[,]" including Karloff, but did not charge all of the sub-dealers below him, such as Marks and Appellant. *Id.* at 17, 18. An agent that worked on that investigation stated that Appellant and Marks were identified as directly below Karloff in the marijuana business. *Id.* at 66.

affidavits. *See id.* at 68-83. Police also obtained approval of a non-consensual intercept (wiretap) on telephones utilized by various members of the organization, noting that "[i]n an attempt to conceal incriminating conversation from law enforcement agents who may be monitoring their conversations and pagers, drug traffickers will use codes and cryptic language." *See id.* at 83-84, 85. The affidavit provides that the following interceptions pertinent to Appellant occurred, which we have produced *verbatim*, with the exception of substituting Appellant's name with Appellant:

> **March 9, 2014 at 12:40 PM, Call 421 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks, Outgoing call to 267-784-3073, utilized by Michael Lynch**
>
> This conversation was between Jason Marks and Michael Lynch. In the beginning of the conversation they talk about a trailer. Marks then said, "I was going to ask you if you wanted to bring the rest of those contracts over, everything that's left on there, the remainder of the paperwork, know what I mean, and then we can get that out, but I'll just come over." Through our training and experience we believe Marks attempted to conceal the true reason for this call and the need to visit Lynch's residence. Marks initially said contracts and then paperwork but he attempted to clarify the true meaning to Lynch by saying, "Know what I mean." We have learned that terms such as "Paperwork" are commonly used as a code word. These code words are known by each member of the organization. We believe these words used in this context are referring to Marijuana being stored at Lynch's residence at 41 Hickory Lane, Boyertown, Berks County, Pennsylvania.[4]

---

[4] The affidavit sets forth that, based on the affiants' training, knowledge and participation in controlled substances investigations, they know that:

> It is common for large[-]scale drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure

As the conversation continued Lynch said he was not currently home. Marks told Lynch that, "I'm not going over at least an hour and a half." Lynch continued on and said, "Well um give a buzz and if I have to go anywhere I'll just leave that thing unlocked. This portion of the call further supports our opinion that this conversation is in furtherance of their drug trafficking organization. We received information from that a Confidential Informant observed fifty pounds of Marijuana in a garage on Lynch's property located at 41 Hickory Lane, Boyertown, Berks County, Pennsylvania. This Confidential Informant also detailed how trusted confederates have access to this location. This portion of the conversation detailed that the area Marks' needs access to is commonly locked but will be left unlocked for Marks' access. The exact location is not being disclosed in the conversation due to the fact that both of these individuals understand the code being used, the area Marks needs to access and the purpose for his visit.

On Sunday, March 9, 2014 at 9:00 AM, in reference to calls: 360, 362, 363, 421, 446, Docket 38-1 E.D. 2014, and calls 533, 534, 535, 545, 552, Docket 38-3 E.D. 2014, Plant advised that Jason Marks would be going to Michael Lynch's residence, located at 41 Hickory Lane, Boyertown, Pennsylvania. At approximately 10:00 AM, Detective Fedak did observe a black Mercedes and a black Ford pick-up truck at Marks' residence, located at 2922 Kutztown Road, East Greenville, Pennsylvania. Marks does have a 1995 Mercedes, Pennsylvania Registration HXB-4548 and a 2004 Ford Truck, Pennsylvania Registration ZDS-8238 registered to him with the address listed as 2922 Kutztown Road, East Greenville, Pennsylvania.

---

locations within their residences, the residences of trusted family members and associates, garages, basements, attics, outbuildings, vehicles, and/or their businesses for their ready access and to conceal from law enforcement authorities. We know they need ready access to them in order to operate their illegal drug business.

*Id.* at 14.

At approximately 1:00 PM, Detective Fedak drove past Marks' residence and noticed that Marks' Ford truck was not parked in his driveway.

At approximately 4:21 PM, Detective Leporace observed Marks driving his Ford truck, Pennsylvania Registration ZDS-8238 in the area of Lynch's residence located at 41 Hickory Lane, Boyertown, Pennsylvania. Marks was the only person in the vehicle. Detective Lackner observed the aforementioned Ford truck pull onto Laurel Valley Lane which leads to Hickory Lane.

**March 9, 2014 at 9:04 PM, 10:18 PM, 10:20 PM, 10:22 PM, 10:23 PM, 10:34 PM, 10:40 PM, 10:42 PM, 10:46 PM Call 474, 482, 483, 484, 485, 488, 489, 490, 491on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks, Incoming/Outgoing calls/text to/from 267-304-2788. utilized by [Appellant].**

This conversation is between [Appellant] and Jason Marks. [Appellant] returned Marks' phone call. In the beginning of the conversation [Appellant] justified why he did not pick up the phone. Marks then asked, "Feel like seeing chocolate." Marks then laughed. [Appellant] replied, "I never mind." We believe the term "seeing chocolate" is in actuality a code word used between these two individuals to determine a meet location. We have learned through our experience in non-consensual interceptions that individuals involved in the distribution of controlled substance attempt to conceal the exact place of a meeting by using code words to determine the location. This is done due to their fears of being intercepted. They do not want to give a specific location over the phone and alert law enforcement on where the clandestine meeting will take place.

As they continued Marks informed [Appellant], "I'm bringing fifteen bucks with me you know." Here again, we believe Marks is providing information to [Appellant] in code. We believe [Appellant] responded and attempted to legitimize the conversation and said, "Yeah, that should do like a half a song between we'll put the money together and make and have her give us a lap dance or something." Marks continued to talk in code and said, "I'm a little scattered on it but yeah it's cool." We have learned from information obtained through this investigation that this organization sells various types of Marijuana one of which is "Scatter Brain." We believe when Marks said, "scattered" he informed [Appellant] on the type of Marijuana being brought.

- 9 -

They agreed to talk again prior to meeting. Marks expects to be at the meet location within an hour and a twenty and I'll be over the spot." [Appellant] responded, "Sounds good brother." Although they did not give a location both know where the meeting will take place. We believe Marks is bringing "fifteen" to [Appellant].

At approximately 9:45 PM, Detective Lackner observed A Mercedes Benz, dark in color, displaying Pennsylvania Registration Number HXB-4548 exit the driveway at 2922 Kutztown Road, E. Greenville, Pennsylvania 18041. Surveillance Detectives Lackner and Vinter maintained mobile surveillance of the aforementioned vehicle as it travelled to the area of the Schuylkill Expressway (Rt. 76). At that time, Detectives Wood and Rowe participated in the mobile surveillance as the Mercedes Benz travelled to the city of Philadelphia. During this surveillance, Detective Vinter positively identified the driver of the Mercedes Benz as Jason Marks. An inquiry made on the aforementioned Mercedes Benz though the Pennsylvania Bureau of Motor Vehicles shows the registration displayed on a 1995 Mercedes Benz registered to Jason Marks, 2922 Kutztown Road, E. Greenville, Pennsylvania 18041.

In call 482 Marks contacted [Appellant] and attempted to change the location and said, "I'll see you in about twenty, twenty five minutes at the roll cage." [Appellant] does not understand the meet location and Marks clarified the location and responded, "The one I knocked off it's hinge." [Appellant] then understood and does not want to meet there and said, "No, no, no, no, no I thought you were going to place where you with the chocolate lady…. I'm trying to avoid going over there." The two then agreed to go to the initial meet location. Here again the two talked in a coded language. This portion of the conversation showed us that these individuals have multiple locations where they meet in furtherance of their drug trafficking.

At 10:20 PM Marks sent a text to [Appellant] which read, "My car don't lock right so can I put my gym bag in your car when I get there." [Appellant] responded, "K. Forget u gt no tints. Makes safety in city a plus. Dnt gt Ur windows broken."

At 10:34 PM Marks sent a text to [Appellant], which read, "3 minutes." We believe Marks informed [Appellant] he was three minutes away from the meet location. In call 489 Marks called [Appellant], [Appellant] told Marks, "I'll be right there brother I

can't talk on the phone my battery dying." Marks responded, "All right later."

At approximately 10:40 PM, referencing calls number 488, 490 and 491, Docket 38-1 E.D. 2014, Detective's Vinter and Wood observed Jason Marks enter the parking lot of the Atlantis Gentlemen's Club located at 3813 Chestnut Street, Philadelphia, Pennsylvania 19104. Marks backed his vehicle in to a parking space and sat in the vehicle.

At 10:42 PM, Marks sent a text to [Appellant,] which read, "Drive through the parking lot behind the club." Approximately three minutes later, [Appellant] responded via text, "Don't see u."

Approximately (3) three minutes later, Detective Vinter observed a Toyota Camry, White in color, displaying Pennsylvania Registration Number HKE-0962, enter the same parking lot. The vehicle stopped in the area of Marks vehicle. At the same time, Marks was observed exiting his vehicle and yelling something at the driver of the Toyota Camry. Both vehicles left the parking lot together. An inquiry made on the aforementioned Toyota Camry though the Pennsylvania Bureau of Motor Vehicles shows the registration displayed on a 1995 Toyota registered to Ruben Enrique Morales[, which is Appellant's name,] address of 3022 N. 5th Street, Harrisburg, Pennsylvania 17110.

At approximately 10:50 PM, both vehicles turned left onto Chestnut Street and pulled over to the shoulder of Chestnut Street at 37th Street. As Detective Rowe was driving past the vehicles, he observed [Appellant] standing at his open trunk. Seconds later, Detective Wood drove past the vehicles and observed [Appellant] standing at the driver side window of the Mercedes Benz talking to Marks who was seated in the driver seat. Both vehicles remained at this location for approximately (5) five minutes. Detective Wood positively identified the person operating the Toyota as being [Appellant].

At approximately 10:55 PM, both vehicles departed the immediate area. Surveillance was maintained on the Toyotas Camry being operated by [Appellant].

As these two individuals talked they alluded to the fact that they were going to patronize a drinking establishment. They did not. Marks and [Appellant] met on the street and then departed. Due to this there was no reason to for Marks to request the placement of his gym bag in [Appellant's] vehicle. We believe this meeting

- 11 -

occurred for a delivery of Marijuana from Marks to [Appellant]. We also believe Marks not only spoke cryptically in arranging the purpose and location of the meeting but also attempted to justify why a bag would be moved from his vehicle to [Appellant's] vehicle.

At approximately 11:15 PM, surveillance followed [Appellant] directly to the area of Fontain Street, Philadelphia, Pennsylvania. Detective Rowe observed [Appellant] exited his vehicle and walk to 1537 Fontain Street, where he utilized a key to unlock the front door and enter. Detective Rowe, drove around the block to position his vehicle in a secure parking spot. When he returned, [Appellant] was observed exiting a secondary unknown address on the 1500 block of Fontain and returning to 1537 Fontain Street. Seconds later, [Appellant] exited the residence, where he appeared to lock the front gate on the door. [Appellant] walked back to his vehicle and left the area.

At approximately 11:25 PM, surveillance was maintained on [Appellant] as he went to the 2000 block of Carlisle Street, Philadelphia, Pennsylvania. Detective Lackner observed [Appellant] park his Toyota on Carlisle Street and enter a house located at 2051 Carlisle Street, utilizing a key. Approximately ten minutes later, [Appellant] exited this residence and left the area operating his Toyota.

Surveillance was maintained on [Appellant] as he left 2051 Carlisle Street. Surveillance lost sight of [Appellant] in the area of Front at Diamond Street. Approximately five minutes later, Detective Lackner located [Appellant's] vehicle parked unoccupied in the 2100 block of Susquehanna Avenue, Philadelphia, Pennsylvania. Surveillance was conducted on the unoccupied vehicle for several minutes. During that time, [Appellant] never returned.

Detective Harris and Detective Echevarria believe that this is a fifteen pound marijuana delivery that began on March 8, 2014 with Marks contacting Lynch to see if he could stop over the next morning. The conspiracy continued on March 9, 2014 when Lynch and Marks said, "I was going to ask you if you wanted to bring the rest of those contracts over, everything that's left on there, the remainder of the paperwork, know what I mean, and then we can get that out, but I'll just come over." Marks then picked up the marijuana from Lynch to deliver to [Appellant].

**ADDITIONAL SURVEILLANCE OF [APPELLANT] PHILADELPHIA**

On Monday, March 17, 2014 at approximately 8:00 AM, Detective Vinter conducted surveillance in the city of Philadelphia in search of [Appellant's] vehicle. At approximately 10:00 AM, Detective Vinter located a Toyota Camry, white in color, displaying Pennsylvania Registration Number HKE-0962 parked unoccupied on 15th Street near Fontain Street, Philadelphia, Pennsylvania. This area is within close proximity of 1535-1537 Fontain Street. The vehicle was snow covered from an overnight snow storm. An inquiry made on the aforementioned Toyota Camry though the Pennsylvania Bureau of Motor Vehicles shows the registration displayed on a 1995 Toyota registered to Ruben Enrique Morales, [*i.e.*, Appellant,] address of 3022 N. 5th Street, Harrisburg, Pennsylvania 17110.

Detective Vinter drove around the block in attempt to obtain a fixed position on the vehicle. When Detective Vinter returned, a Hispanic male, believed to be [Appellant] was cleaning the snow off the vehicle with a small broom. [Appellant] was wearing blue jeans and a grey hooded sweat shirt. After the vehicle was cleaned of snow, [Appellant] entered the driver's seat and left the area. He was not followed.

On Friday, March 21, 2014 at approximately 8:00 AM, Detective Vinter located a Toyota Camry, white in color, displaying Pennsylvania Registration Number HKE-0962 owned by [Appellant] parked unoccupied on the southwest corner of Diamond Street at Carlisle Street, Philadelphia, Pennsylvania. This area is within close proximity to 2051 Carlisle Street. As previously mentioned in a surveillance report dated March 9, 2014, Detective Lackner observed [Appellant] park his Toyota on Carlisle Street where he utilized a key to enter a house located at 2051 Carlisle Street. Detective Vinter maintained surveillance in the area for approximately four hours.

At approximately 12:00 PM, Detective Vinter observed a black male, wearing a red jacket with the words "Chiefs Football" written on the back. The unknown black male knocked on the front door of 2051 Carlisle Street and remained there for several minutes. After receiving no answer, he left the area.

\* \* \*

- 13 -

**March 17, 2014 at 2:24 PM, 8:00 PM, 8:01 PM, 8:06 PM, Call 1537, 1636, 1637, 1640 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks, Incoming/Outgoing calls/text to/from 267-304-2788, utilized by [Appellant].**

At 2:24 PM Marks called [Appellant] they exchange greetings and then discussed a party at Marks' house located at 2922 Kutztown Road, East Greenville, Pennsylvania that [Appellant] attended. Marks then asked, "Did you leave that application with me?" [Appellant] said, "Yeah." Marks responded, "You did oh boy (laughs) where did I put it (laughs)?" [Appellant] continued, "I knew you fucking forget." [Appellant] then ended call. We believe when Marks said the term, "application" he is referring to U.S. Currency. [Appellant] understood the code. We believe the "application" is actually partial payment for the previously received marijuana on March 9, 2014. This is further supported in later intercepted conversations.

In the first text Marks sent a text to [Appellant], "I'm losing my mind looking for that application." [Appellant] responded, "Check under Ur bed." After a few minutes Marks texted back, "Ya I must have kicked it on there. 5 pages."

\*\*\*

**March 22, 2014 at 1:52 PM, Call 220 on Court Order 38-1 E.D. 2014 (Supplemental Order-215-679-2699), a phone utilized by Jason Marks/[Appellant], Outgoing call to (215) 554-7297, utilized by unknown male referred to as "Henry"**

The call starts and two men conversed in Spanish. The caller asked for "Henry." "Henry" does not recognize the number but recognized the voice and asked, "Who's this [Appellant], yeah, I'm on the road who's phone is this?" [Appellant] then said, "I'm at a friend's house, It's that I don't have cell phone, wait a minute I remember the number of the guy I'll call him from here." In this portion of the call [Appellant] explained to his drug confederate why he called from an unknown number. [Appellant] said, "I'm at a friend's house." We know through surveillance and other intercepted conversations that [Appellant] was calling from Marks' residence located at 2922 Kutztown Road, East Greenville, Montgomery County, Pennsylvania.

[Appellant] continued, "No, crazy, I'm here, when can I see you, cause my friend is leaving Monday?" Henry responded, "Oh yeah." Here, [Appellant] attempted to notify Henry that an individual of

importance to their organization was here but Henry did not understand. [Appellant] continued to stress the need for the two to meet when he said, "The person you have to talk to." Henry then asked, "Where's he going to?" [Appellant] explained, "No, because he lives in the up there in the mountains." Henry then said, "I'm up in the mountains, he's in upstate New York?" No motherfucker, the friend of mine that's on the other side in the mountains. Henry understood the cryptic description of this person's residence and said, "Oh on the west side." [Appellant] responded, "Uh-huh". [Appellant] continued to talk in code and attempted to clarify who this individual was in relation to their illegal activity. We believe when [Appellant] detailed that this individual lived in the mountains and on the other side he was referring to someone living in California. Through the course of this investigation we have learned that this organization's source of marijuana supply is California. We have not received any information that Marks was departing the area on the 24th of March. This leads us to believe that [Appellant] was referring to someone that was in the area from California that was a member of this drug trafficking organization.

Henry then said, "Ah, ok, ok all right, all right, right now I'm going to a couple of appointments you want me to call you back on this number when I get done?" [Appellant] then instructed Henry, "No, no call me on my phone, it's that I'm at this house I don't have service but we're not going to be here, call me on my phone. It's that I want to talk for the man can understand the position that you are in, he's talking about somethings that are in line one what you are talking about but the manner to do it with the papers are right and the address of the people that are involved so they can help do things the way have to be so there isn't problems," the call the ends. Through our training, knowledge and experience we believe this conversation was [Appellant] attempting to broker a marijuana arrangement between two separate parties one of which is Henry Santana and the other we have learned is Larry Kline. At the time of this call we did not know Larry Kline was in the Pennsylvania area but through information received through intercepted conversations and surveillance we know Larry Kline was in Pennsylvania and in Montgomery County and is returning to California on the March 24th.

On Saturday, March 22, 2014 at 2:00 PM, in reference to call 110 at 1:52, Docket 38-1 E.D. 2014, Plant advised that [Appellant]

was at Jason Marks' residence, located at 2922 Kutztown Road, East Greenville, Pennsylvania.

Detective's Fedak and Walsh did observe a grey four door sedan with a Florida Registration parked in the driveway at Marks' residence. The Plant advised that Ruben Morales Melendez[, which closely resembles Appellant's name,] does have a 2006 Buick Lucerne, grey in color, displaying Florida Registration V971RC registered to him with an address of 4240 South West 153 Place, Miami, Florida. This information was ascertained through a law enforcement data base. Surveillance was unable to ascertain a registration out of fear of being compromised.

\*\*\*

**March 22, 2014 at 2:28 PM, Call 1011 on Court Order 38-3 E.D. 2014, a phone utilized by Michael Lynch Incoming Call from 707-834-5621, utilized by Larry Kline**

Lynch received an incoming call from Larry Kline. Kline asked, "What are you doin?" Lynch responded, "I'm on the golf course." Then someone is heard saying "Aw fuck." Kline then asked, "Want to get some dinner?" Lynch responded, "We probably can, your in town I guess huh?" Kline answered, "S/L Yeah." Lynch asked, "Where you out now?" Kline told Lynch, "I'm ah over at the ah fucking dwarf's, he's going to the Poconos for some gambling thing with the wrestling he won't be back till late so I'm with ah [Appellant] I was hoping we could all hang out and get some dinner." Lynch said, "He won't be around but we're definitely up for it." They agree to talk after Lynch is done golfing.

**March 22, 2014 at 6:35 PM, Call 1019 on Court Order 38-3 E.D. 2014, a phone utilized by Michael Lynch Incoming Call from 707-834-5621, utilized by Larry Kline**

Michael Lynch received a call from Larry Kline. Kline said he was at the Tiki Bar having a drink and waiting for Lynch to come home. Lynch said that he was at home having a drink and invited Kline to come up. Kline said he was with [Appellant], and they were going to come up.

**Surveillance**

In reference to call 1019 at 6:36 PM, Docket 38-3 E.D. 2014, Plant advised that [Appellant] and Larry Kline were going to Lynch's residence.

At approximately 6:49 PM, through the use of fixed surveillance, Plant advised that a Hyundai, silver in color, arrived in the vicinity of Lynch's residence located at 41 Hickory Lane, Boyertown, Pennsylvania 19512.

***

**March 23, 2014 at 11:54 AM, 11:58 AM, 11:59 AM, 12:01 PM, 12:02 PM, 12:03 PM, 12:04 PM, Call 2362, 2365, 2366, 2368, 2369, 2370, 2371, on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks, Outgoing/Incoming call/text to/from 267-304-2788, utilized by [Appellant]**

Marks called [Appellant] and asked, "What are you doing today?" Then the call is dropped.

[Appellant] responded to the previous call via text which read, "Gt bad service here. Still sleeping herw." Marks responded, "Omw". We believe that [Appellant] attempted to tell Marks of his location but Marks did not understand. We also know that the text acronym "Omw" means on my way. Marks told [Appellant] that he is on his way. Through surveillance and intercepted communications we know that [Appellant] is still with Kline and they are currently at Lynch's residence located at 41 Hickory Lane, Boyertown, Berks County, Pennsylvania.

[Appellant] then texted to confirm the meet location and sent, "2mikes rt ? Not downtown". This text message elicited a response from Marks, "Are you here im on the fuckin turn pike." [Appellant] confirmed his and Kline's location and texted, "At Mikes." We believe Marks was enroute to a meet location in Philadelphia to meet [Appellant] and Kline due to the text message conversation Marks responded, "Meet me at my place getting off the Lansdale exit I'll be home in 25 minutes." During this exchange [Appellant] confirmed that they were still at Lynch's residence.

**March 23, 2014 at 12:09 PM, 12:11 PM, Call 2373, 2377 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks Incoming/Outgoing Call from 707-834-5621, utilized by Larry Kline**

After the series of text messages from [Appellant], Kline called Marks. It is apparent that Kline is with [Appellant] and that Kline is privy to the communications between [Appellant] and Marks. Marks said, "You guys kill me." Kline asked if Marks was home

- 17 -

and he told him he was not but was driving back from the turnpike. Marks continued on and said, "You knew I was coming down there today, I told you, no I told him I had a taste for the chocolate. I said that plain as day yesterday." As Marks talked to Kline said, "I thought we were coming to your house. He was talking about me coming to your house." We believe that the meeting that occurred on March 22, 2014 at Marks' residence laid the foundation for a follow up meeting between these participants of this drug trafficking organization. The two parties were confused on the location of the meeting. Marks believed he was meeting [Appellant] and Kline in Philadelphia. Marks used coded terminology that was previously intercepted as the meet location. [Appellant] and Kline believed they were returning to Marks residence to meet. We believe that the residence located at 2922 Kutztown Road, East Greenville, Montgomery County, Pennsylvania is the center point of Marks portion of the organization. We also believe through surveillance and intercepted conversation that the residence/buildings located at 41 Hickory Lane, Boyertown, Berks County, Pennsylvania is the center point of Lynch's portion.

As the conversation continued, Kline said "He talked about me coming to your house but. Marks replied, "well yeah that's you me but he needed something.." Marks then mumbled, "for his ah paperwork." Kline then responded, "We'll ah come by your house in a … I don't know in a bit, I'm going to grab something to eat and shit." Marks the said, "okay cause like I don't like ta … have to take it back then you know what I mean … cause I don't wanna figure" Kline then interrupted, "Yeah He'll figure it out, he'll figure it out." The two individuals talked cryptically to conceal the true nature of the need for this clandestine meeting. The two talked in code and mumbled and ended the conversation when it became too detailed.

Marks then called Kline back and said, "You know I'm gonna, I'm comin through Greenlane, I'm gonna go up to Bear Creek and hang out, they're doin the snowmobile races up there… I was already taken out of my day to go do that for him cause he was up my ass about it yesterday so now that I'm not doing that I'm going up there like I was supposed to." Kline then responded, "All right go ahead we'll…" They continued to talk and prior to the call ending Kline said, "All right I'll call you in a bit I'll see you up there."

In the follow up conversation Marks tells the two that he is going to Bear Creek. Bear Creek Mountain Resort was having snow mobile races on this date. Kline agreed to meet with Marks at this location. We know that this meeting will also include [Appellant].

**March 23, 2014 at 3:43 PM, Call 2404 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks Outgoing Call from 267-772-1791, subscribed to Dana Crist utilized by an unknown male**

Marks told the unknown male that he arrived at Bear Creek. This individual was intercepted numerous times in regards to Marks going to Bear Creek. Marks asked the unknown male, "Did you see [Appellant] or Larry?" The Unknown male said, "No." Marks continued to talk and said, "I knew they weren't going to come over, they were like oh, we're hungry we'll see you over there. I'm like why don't you just fucking eat there. That's what fucked up my whole day up or I'd be up there already." The unknown male said, "It's all good man, you have to do what you have to do." Marks then responded, "[Appellant] got these documents you got to look at in the morning, so I started driving down there, well he never told me he never went home last night they went to Lynchies and partied all night." Marks complained about driving to the city and that they were at "Mike's."

In this conversation Marks complained about his morning and his partial drive to Philadelphia. He told the unknown male that he doubted [Appellant] and Kline were going to go Bear Creek but needed to see him. We know through the surveillance that [Appellant], Kline and Marks met and talked at Bear Creek departed and then returned to Marks' residence.

On Sunday, March 23, 2014, in reference to calls 2379 and 2404, Docket 38-1 E.D. 2014, Plant advised that Jason Marks was planning to meet Jeff Roth, [Appellant] and Larry Kline at the Bear Creek Mountain Resort and Conference Center located at 101 Doe Mountain Lane, Macungie, Pennsylvania 18062 for a snow mobile event.

**Surveillance**

At approximately 9:00 AM, Detective's Vinter and Wood went to the Bear Creek Mountain Resort/Conference Center and confirmed the resort was having a "snow mobile drag race competition". Detective Vinter and Wood maintained surveillance at the resort.

At approximately 1:45 PM, Detective Walsh arrived at the Bear Creek Mountain Resort/Conference Center and observed a Mercedes Benz, displaying Pennsylvania Registration Number JHN-0729, being operated by Jason Marks arrive. Marks parked his vehicle in the upper parking lot near the resort and walked toward the hotel/ski area.

**March 23, 2014 at 2:52 PM, Call 2422, 2430 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks Incoming/Outgoing Call from 707-834-5621, utilized by Larry Kline**

In call 2422 Marks called Kline to check on their location. Marks said, "Where you at?" Kline confirmed to monitors that [Appellant] was still with him when he said, "We're on our way to Bear Creek where you at?" Marks then described his location at Bear Creek. Kline told Marks, "I'll be up there in like ten minutes."

In the second call Kline arrived at Bear Creek and contacted Marks to ascertain his location. Marks told Kline, "I came into that lower bar the regular one where we had dinner." Kline said he will see Marks in a minute.

March 23, 2014 at 7:18 PM, Call 2450 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks Incoming Call from 215-272-1112, utilized by Unknown Male.

Marks received a call from an unknown male and they exchanged greetings. The unknown male then said, "Larry told me to give him a call I don't know if they are still around." Marks responded, "They just left my house .. they're probably on their way to the turnpike right now if you want to give em a buzz." This is yet another local individual in contact with Kline. Kline instructed this individual to call him. We know Larry Kline is currently utilizing at least one communication device in furtherance of his portion of this organization. The communication we identified was a Verizon Wireless mobile phone 707-834-5621. This call further substantiated Kline being at Marks' residence.

The unknown male declined calling Kline at that time and then said, "Hey a [Appellant], [Appellant] gave me a chore to do I probably". Marks understood the "chore" given by [Appellant] to the unknown male and responded, "I know whenever this week that's fine." The caller said, "Probably gonna be Tuesday." We believe this "chore" is an instruction received by this individual by [Appellant]. Due to the fact that they use the code word "chore"

- 20 -

we further believe that this action is in furtherance of this drug trafficking operation.

The Unknown male continued on and talked about problems with his Lincoln. The unknown male said, "My place is up at Quakertown so I'll just get in touch with you all right. I didn't know if you guys were hanging out tonight or doing anything what's Larry heading back to California?" Through this portion of the call we are able to determine that not only does the Unknown Caller know Kline but knew that he is from California with pending plans to return to California.

Marks answered the caller, "I guess he's leaving at eight in the morning." The caller continued on about the "chore", "All right I'll be in touch with you if it happens tomorrow if not Tuesday." Marks then told the caller about Kline, "He didn't seem like he wanted to hang and party, he just came in to get some numbers straight."

When Marks said, "He didn't seem like he wanted to hang and party, he just came in to get some numbers straight" leads us to believe that Kline was in this part of the country in regards to the marijuana trafficking organization. We also believe Marks told the unknown male that Kline was here to focus on the task at hand, "get some numbers straight." Through our training, knowledge and experience we know that large scale drug organization handle large amounts of illegal drugs and in turn the U.S. Currency generated from their illegal activity. We also know that the illegal drug, in this investigation marijuana, equates to money. The quicker the product is ordered, obtained and then distributed the quicker the drug traffickers yield their profit. We know Larry Kline arrived in Pennsylvania to meet with important members of his drug trafficking organization, including but not limited to, [Appellant], Michael Lynch and Jason Marks. The existence of these meetings was documented through intercepted communications and surveillance. We know [Appellant], Kline and Lynch met at Lynch's residence located at 41 Hickory Lane, Boyertown, Pennsylvania. This meeting was arranged via Kline's Verizon Wireless phone and Lynch's phone. The initial conversation intercepted informed monitors that Kline wanted to meet with Lynch, Marks and [Appellant] at the same time but Marks was unavailable.

The next day after meeting with Lynch, Kline orchestrated another meeting with [Appellant] and Marks. This meeting was arranged on his Verizon Wireless phone 707-834-5621. Marks, [Appellant]

and Kline met in a public place. They were together for approximately one hour talking. They then departed the public location and immediately met again at Marks's residence located at 2922 Kutztown Road, E. Greenville, Pennsylvania 18041. They were at this location getting "numbers straight" for approximately two and a half hours. The change of location leads us to believe that portions of this conversation were too sensitive in nature to discuss in a public location and/or they needed access to items stored within Marks' residence. We believe the phone calls and meetings between these individuals occurred to finalize details of a pending marijuana delivery and/ or a previous marijuana delivery received by the Montgomery/Berks County portion of this organization.

**Surveillance**

At approximately 2:54 PM, in reference to call 2422, Docket 38-1 E.D. 2014, Plant advised surveillance that Larry Kline was 10 minutes away from the Bear Creek Mountain Resort/Conference Center.

At approximately 3:06 PM, Detective Vinter observed a Hyundai, silver in color, displaying Florida Registration Number BPI-A49 arrive at the resort. As previously documented in surveillance reports, this is a rented vehicle and operated by Larry Kline and/or [Appellant]. An inquiry made through the Berks County Police Radio Network on BPI-A49 shows it displayed on a Hyundai registered to PV Holding Co., address of 8600 Hanger Blvd., Orlando, Florida.

Detective Vinter followed the vehicle to the parking area. Two males believed to be [Appellant] and Larry Kline exited the vehicle and walked toward the competition.

At approximately 4:00 PM, Detective Vinter and Fedak, acting in an undercover capacity, observed four males sitting in the grille/bar area. The Grille is a full-service restaurant and bar offering a spectacular mountainside view. Three of the four individuals were positively identified to be [Appellant], Larry Kline and Jason Marks. The remaining individual was believed to be Jeff Roth.

At approximately 4:15 PM, it appeared the individuals were getting ready to leave the establishment. Detective Fedak and Vinter, who were standing within close proximity of the

individuals, overheard one say; "Be careful, stay in the left lane." They all left the area and walked to their respective vehicles.

Surveillance was maintained on the Hyundai, silver in color, displaying Florida Registration Number BPI-A49. Although it was not known who the operator of the vehicle was, it is believed the vehicle was occupied by [Appellant] and Larry Kline. Surveillance followed the vehicle directly to the Jason Marks' residence, located at 2922 Kutztown Road, E. Greenville, Pennsylvania 18041. Detective Walsh observed the vehicle enter the driveway and park. Two males were observed exiting the vehicle and walking toward the residence.

At approximately 5:28 PM, Detective Lackner observed (3) three males standing next to the Hyundai. Moments later, the males returned to the residence.

At approximately 7:08 PM, Detective Lackner observed an unknown male enter the Hyundai and back it up against the house and partially out of view. Moments later, Detective Lackner observed the Hyundai exiting the driveway where it proceeded southbound on Kutztown Road. Surveillance lost sight of the vehicle prior to arriving at RT 663.

At approximately 8:15 PM, Detective Vinter arrived in the area of 2051 Carlisle Street, Philadelphia, Pennsylvania. Detective Vinter observed [Appellant's] Toyota Camry, white in color, displaying Pennsylvania Registration Number HKE-0962 parked unoccupied on the northeast comer of Diamond Street at Carlisle Street, Philadelphia, Pennsylvania. This area is within 30 yards of 2051 Carlisle Street. An inquiry made on the aforementioned Toyota Camry though the Pennsylvania Bureau of Motor Vehicles shows the registration displayed on a 1995 Toyota registered to Ruben Enrique Morales[, *i.e.*, Appellant], address of 3022 N. 5th Street, Harrisburg, Pennsylvania 17110.

At approximately 9:58 PM, Detective Fedak and Reynolds observed a Hyundai, silver in color, displaying Florida Registration Number BPI-A49 parked unoccupied parked on the northeast comer of Diamond Street at 15th Street. This area is located within close proximity of the Toyota Camry, owed by [Appellant] that was parked on the northeast corner of Diamond Street at Carlisle. Both vehicles remained at the aforementioned locations. Surveillance was terminated at 11:30 PM.

\*\*\*

**March 26, 2014 at 12:57 PM, 5:26 PM, Call 2991, 2998 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks Outgoing call to 267-304-2788, utilized by [Appellant]**

In the first call Marks and [Appellant] talked about meeting. Marks told [Appellant] that he was currently in Philadelphia. Marks asked [Appellant], "Should I come by and see you or ain't it worth it right now?" [Appellant] responded, "If you want to come by, you can come by I'd like to talk to you about a couple of things but ah it's up to you." Marks confirmed that he would see [Appellant]. We believe through our training, knowledge, experience and information gleamed from this investigation we believe Marks attempted to see [Appellant] to obtain U.S. Currency. When Marks asked, "ain't it worth it right now?" we believe Marks asked [Appellant] if he had enough U.S. Currency to justify Marks's trip. We believe [Appellant] not only agreed to meet Marks but also showed his concern for talking on the phone. [Appellant] showed his hesitation about talking on the phone when he said, "I'd like to talk to you about a couple things." We have learned that individuals involved in the distribution of illegal drugs will commonly openly discuss general conversation and/or issues that are not illegal. We also learned that when the conversation turns to their illegal activity they speak cryptically or in code but if the conversation needs to detailed they will attempt to meet in person. We believe [Appellant] showed his concern by trying to meet with Marks to talk in person.

In the second call, Marks called [Appellant, and] they briefly talked about meeting. Marks told [Appellant] that he looked at house to purchase with "Mike" to renovate and sell. [Appellant] then attempted to end the call. [Appellant] said, "Call me back later, I'm busy right now, call me, call me back later when you're coming through back up I won't be at the house just call me we'll meet somewhere." Marks responded, "Is it important?" [Appellant] said, "No." Then Marks continued, "I just need, I just wanted to see you by Monday you know so we could get that ah paper signed to send it out in the mail." [Appellant] then asked, "What's the date?" Marks answered, "Ah, Tuesday is when it needs to be in, when it's going out in the mail. I just need to have the contract signed by then so whenever, just so you know, whatever by then that's good." [Appellant] responded, "Maybe I'll see you Monday." The conversation continued and Marks told [Appellant] about a bonfire at Marks residence.

We believe the second conversation further substantiated our belief that Marks wanted to see [Appellant] to obtain U.S. Currency for previously delivered marijuana. We believe that when Marks said, "I just wanted to see you by Monday you know so we could get that ah paper signed to send it out in the mail", Marks was telling [Appellant] he wanted the U.S. Currency. We have learned through our training and experience that organizations, such as this drug organization, will gather their money from their customer base and transport it to their source of supply to purchase more of their illegal product. We believe that this marijuana trafficking organization is preparing to purchase more marijuana and are pooling/collecting U.S. Currency to prepare for the purchase.

\*\*\*

**March 28, 2014 at 3:57 PM, Call 3225 on Court Order 38-1 E.D. 2014, a phone utilized by Jason Marks Incoming call from 215-272-1112, utilized by Unknown Male**

The two talked and Marks explained why he was not around to meet the unknown male. The unknown male asked, "Did you want to maybe stop over?" Marks said, "You want me to swing past the house I'm picking my son up right now." The unknown male responded, "I just left [Appellant's] house. Actually, I just left, I did his personal house, I did all his other houses in the past." The agreed to talk again to arrange the meeting Marks said, "Dump that off that'll be fine." The unknown male asked, "Did you see that guy from the band." Marks responded, "Yeah, that's not going to happen."

We know this individual in contact with [Appellant], Larry Kline and Jason Marks. This conversation shows how [Appellant] has access and control over numerous residences and one these residences is referred to as his "personal house."

*Id.* at 97-104, 127, 140-42, 144-45, 146-53, 169-71, 172.

In addition, the Fontain Street affidavit provides the following information regarding Appellant:

**March 21, 2014 In a series of telephone calls/texts between [Appellant] and an unknown male using telephone facility 909-446-2610, intercepted on Court Order 38-7 E.D. 2014**

- 25 -

[Appellant] and the unknown male discuss the fact that [Appellant] has this male's motorcycle and is holding it as collateral as the male still owes [Appellant] approximately $5,000. During these conversations and text messages, [Appellant] tells the male that the motorcycle is being kept at a location he describes to the other male as 2027 N. 18th Street, Philadelphia, Pennsylvania.

**March 31, 2014 at 1:33 PM Call 313 on Court Order 38-7 E.D. 2014, a phone utilized by [Appellant] incoming call from 215-290-7229, utilized by an unknown male**

[Appellant] received a call from an unknown male. The Unknown male requested to meet with [Appellant]. [Appellant] said he was having lunch with an unknown female at Fontain. They agree to meet in a short period of time at the caller's residence or at a residence on Fontain.

In call 328 [Appellant] said he was in Fontain and exiting the door. [Appellant] gave directions to the unknown male to Fontain. Det. Echevarria listened to the directions given by [Appellant] and these directions are consistent to the residence located at 1537 Fontain Street.

**Grand Jury Information**

On Monday, March 24, 2014, Montgomery County Grand Jury Subpoena Number 31 (Investigation Number 14, MD: 1607-13) was served upon the Exelon Corporation, DBA: PECO Energy for information including, but not limited to subscriber and billing information in the name of [Appellant] and properties that have been identified thus far to be associated with [Appellant].

On Monday, March 31, 2014, in response to that subpoena, PECO Energy provided the requested information, which included but not limited to the residence of 1537 Fontain Street, Philadelphia, Pennsylvania. The PECO Energy service for 1537 Fontain Street, Philadelphia, Pennsylvania is the name of Ruben Morales[, which is Appellant's name,] at 4240 SW 153rd Pl, Miami, Florida….

*See* Commonwealth's Exhibit 2 at 174-75 (Fontain Affidavit).

Here, the trial court determined that the affidavits submitted in support

of the search warrant requests for 2051 Carlisle Street and 1537 Fontain

Street contained sufficient probable cause to support a nexus between those locations and the presence of controlled substances, books and records, U.S. currency, and telephones, among other things. The trial court rationalized:

> [R]eference is made to [Appellant] throughout the affidavits of probable cause prepared in support of search warrants for both Philadelphia locations. ***See*** N.T., 11/14/17; Exhs. C-1 and C-2, pp. 18, 65-66, 98-103, 127, 140-[]42, 146-[]53, 169-[]71 and 175. Those references detail [Appellant's] involvement in the marijuana distribution organization and his entry into the two Philadelphia properties on March 9, 2014, following what law enforcement believed was a drug transaction.
>
> In giving the required deference to the issuing authority's probable cause determination, this court stated at the suppression hearing:
>
>> This case involves the investigation of an alleged drug conspiracy spanning several counties, including Montgomery County and Philadelphia. The affiants are experienced drug enforcement officers. The affiants assert that[,] in their training and experience[,] persons involved in drug trafficking operations secret[e] contraband, proceeds of drug sales, records of drug transactions and currency in secure locations in their residences. Persons involved in drug trafficking commonly use cellular phones[,] which contain saved messages and outgoing phone calls and photographs and other information about co-conspirators and customers. The affidavit details a number of telephone calls involving [Appellant] and other members of the alleged drug distribution conspiracy. The affiants assert that the coded language used in these calls, based on their training and experience, demonstrate the participants' involvement in drug distribution…. During one of the recorded phone calls, [Appellant] is to meet with an alleged co-conspirator in Philadelphia. Based on the contents of those calls and the affiants' interpretation of the coded language used by the participants, the affiants believe that [Appellant] was engaged in a transaction involving fifteen pounds of marijuana. [Appellant] is then seen driving to 1537 Fontain Street in Philly and using a key to enter the property. Shortly thereafter, [Appellant] is seen leaving the Fontain

> Street property and driving to a property at 2051 Carlisle Street in Philadelphia. [Appellant] is seen entering the property using a key. Investigators requested warrants for both the Fontain Street and Carlisle Street properties in order to search for, among other things, controlled substances, books and records, U.S. currency, indicia of occupancy and telephones and the information contained therein. The search warrants were executed by a Common Pleas Court judge in Philadelphia…. Sufficient evidence exists in the Affidavit of Probable Cause in order for the issuing authority to have found a fair probability that contraband, including currency and cellular phones, would be found at the two properties.
>
> Based on the above, the affidavits submitted in support of the requests for search warrants for the two Philadelphia properties contain sufficient probable cause. This court, therefore, did not err in declining to upset the issuing authority's probable cause determination and denying [Appellant's] motion to suppress.

TCO at 5-6 (internal citation and footnotes omitted).

Appellant argues that, in the trial court's opinion, the trial court "referred to a single incident, discussed in the Affidavit of Probable Cause, on March 9, 2014[,] where the police observed what they believed could be a transaction involving fifteen pounds of marijuana, with … Appellant then driving to 1537 Fontain Street and allegedly using a key to enter the premises[,]" and then shortly thereafter, police saw him "leaving that location and driving to 2051 Carlisle Street, again supposedly entering the property using a key." Appellant's Brief at 9. He contends that "these factual references could not be sufficient, upon objective review, to establish a fair probability that contraband would be found on those premises." *Id.* at 9-10. He points out that "[a]t no time did the police observe [him] engage in a narcotics transaction[,]" "[n]o bags were seen going or coming from either location[,]"

- 28 -

and he "was not even observed carrying anything in his hands." *Id.* at 11. Moreover, he says that the Commonwealth has asserted that "'members of this drug organization' kept items related to their drug business, such as cash, drugs and cell phones, in their homes, and that evidence obtained through recorded conversations between members of the organization showed plans to pick up cash or drugs at each others' homes[,]" but insists that none of those conversations involved him and made no reference to either the Fontain Street or Carlisle Street properties. *See id.* at 11-12. He also states that, "[a]lthough the [a]ffidavit discussed information provided from October 2010 to February 2013 by ten informants and four concerned citizens, none of that information pertained to … Appellant or to either of these locations." *Id.* at 12. He says that the Commonwealth is "relying upon a theory that people who may be involved in marijuana trafficking would likely place their sales proceeds and records of transactions in their homes[,]" and states that there are no decisions from our Supreme Court determining that "a fair probability of marijuana being found in a location attributed to the [d]efendant automatically exists merely because he has allegedly been engaging in a drug trafficking scheme with others." *Id.* at 12, 13.

No relief is due. Looking at the information provided within the four corners of the affidavits from the perspective of the issuing authority, we deem it sufficient to support the conclusion that probable cause existed to believe that contraband or evidence of drug trafficking would be found at the Carlisle Street and Fontain Street properties. *See Huntington*, *supra.* As the

Commonwealth discerns, "[t]he warrant affidavits established that [Appellant] was part of an active drug trafficking organization whose members used their homes to store drugs, money, and other items related to their illegal business. There was thus a fair probability that evidence related to drug trafficking would be found inside [Appellant's] homes." Commonwealth's Brief at 10. The Commonwealth aptly observes:

> [Appellant] was connected to the homes on Fontain and Carlisle Street. Police determined that [Appellant's] name was on the electric bill at Fontain Street. He went directly to Fontain Street after the transaction with Marks on March 9, 2014, and entered and left that house utilizing a key. [Appellant] also went [to] Carlisle Street right after the transaction with Marks, using a key to enter and exit. And on other occasions, police observed [Appellant's] car parked close to the Carlisle Street house, and, on one of those occasions, saw [Appellant] cleaning snow off [of] the car, thus supporting the inference that he resided on Carlisle Street.

*Id.* at 15; *see also* Appellant's Brief at 8 (referring to these locations as "two residences"). Moreover, intercepted calls and surveillance suggested that Appellant probably conducted drug trafficking out of his homes; for instance, an unknown male — who had contact with Kline, Marks, and Appellant — told Marks that he had just left Appellant's personal house, and had, in the past, visited all of Appellant's other houses. *See* Carlisle Affidavit at 172.

In addition, because the affidavits detail a widespread drug trafficking organization of which Appellant was an active, high-ranking member, we find distinguishable the cases relied upon by Appellant involving merely one or two drugs transactions. *See* Appellant's Brief at 12-23. Instead, we deem more apt the case of *Commonwealth v. Iannelli*, 634 A.2d 1120 (Pa. Super.

1993), in which this Court rejected Iannelli's argument that no probable cause existed for a search warrant of a house where the police did not state specific facts to support that the house was Iannelli's residence, and the only connection between him and the house was the averment that it was his residence. *Id.* at 1131. This Court deemed sufficient the police officers' averments that, through electronic, photographic and physical surveillance, they had determined that Iannelli resided there and was heading illegal gambling operations. *Id.* Further, we stated that "it was a matter of common sense that the most likely place to find the physical evidence of gambling would be at Iannelli's home[,]" and accordingly concluded that the affidavit provided probable cause to support the issuance of the search warrant. *Id.* at 1132.

Similarly, and given the totality of the circumstances set forth in the affidavits — including, *inter alia*, Appellant's numerous communications with Kline and Marks, his cryptic conversations and the affiants' learned interpretation of them, Appellant's meetings with Kline, Marks, and Lynch, the 2007 investigation, and the March 9, 2014 surveillance — the issuing authority in the case *sub judice* made a practical, common sense decision that there was a fair probability that contraband or evidence of drug trafficking would be

found at the Carlisle and Fontain properties.[5]  Therefore, we conclude that the trial court properly denied his motion to suppress.

## II.

In Appellant's second issue, he argues that "the evidence was insufficient to prove that [he] was guilty of any of the charges for which he was convicted in the lower court where constructive possession was not proven beyond a reasonable doubt."  Appellant's Brief at 24 (capitalization and emphasis omitted).  He claims that the Commonwealth did not prove that

_____

[5] To the extent Appellant claims that the warrants were too old given the time that passed between the March 9, 2014 surveillance and the execution of the warrants at the end of that month, we deem this argument waived as he does not indicate to us where he raised it below.  **See** Appellant's Brief at 13-14; **see also** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information."); Commonwealth's Brief at 20 (arguing that Appellant waived this issue by not raising it in the suppression court below).  Nevertheless, even if not waived, we would agree with the Commonwealth that "[w]hen viewed in the totality, … the affidavits established evidence of an ongoing drug trafficking business that was likely to continue to exist up to the time the warrant was issued and executed."  Commonwealth's Brief at 20 (citing **Commonwealth v. Jones**, 668 A.2d 114, 118 (Pa. 1995) (plurality) ("A showing that criminal activity is likely to have continued up to the time of the issuance of a warrant renders otherwise stale information viable.") (citations omitted)); **see also Commonwealth v. Macolino**, 485 A.2d 1134, 1138 n.2 (Pa. Super. 1984) ("Probable cause for the issuance of a search warrant must be established at the time the warrant is issued; therefore, evidence of criminal activity at some prior time will not support a finding of probable cause on the date the warrant issues unless it is also shown that the criminal activity continued up to or about that time.") (citation omitted).

he had "conscious dominion or control over the controlled substances that were seized" from either the Carlisle or Fontain Street properties. *See id.* at 25.

Our standard of review for sufficiency-of-the-evidence claims is well-established:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing on the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Bricker*, 882 A.2d 1008, 1014 (Pa. Super. 2005) (citation omitted).

When substances are not found on the defendant's person, the Commonwealth must establish that the defendant constructively possessed the substance. *Id.* This Court has explained:

> Constructive possession requires proof of the ability to exercise conscious dominion over the substance, the power to control the contraband, and the intent to exercise such control. Constructive possession may be established by the totality of the

circumstances. We have held that circumstantial evidence is reviewed by the same standard as direct evidence—a decision by the trial court will be affirmed so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.

*Id.* (internal citations and quotation marks omitted).

Here, the trial court reasoned:

[I]n addition to a number of relevant pieces of evidence, including thousands of dollars in U.S. currency and drug paraphernalia, the search of 2051 Carlisle Street in Philadelphia resulted in the seizure of marijuana, heroin and cocaine. The search of 1537 [Fontain] Street revealed the presence of a large amount of marijuana and other indicia of drug activity….

The evidence presented at the stipulated bench trial proved beyond a reasonable doubt that [Appellant] had actual and/or constructive possession of the controlled substances found at the Philadelphia properties. The evidence showed [Appellant] was involved in a marijuana distribution organization with a number of other individuals. [Appellant] had access and keys to both Philadelphia locations and was seen entering the properties shortly after a suspected drug transaction on March 9, 2014. [Appellant] was inside the Carlisle Street residence at the time the search warrant[] was executed. During that search, [Appellant] complained about laws against marijuana.[6] When reminded that it is illegal in Pennsylvania to traffic marijuana, [Appellant] demonstrated his consciousness of guilt by getting on his knees and asking a detective to shoot him. All of this evidence amply demonstrated that [Appellant] was part of a marijuana distribution organization and that he possessed the controlled substances found at the two Philadelphia locations in connection with his involvement in the trafficking operation.

TCO at 7-9 (internal citations omitted).

---

[6] Specifically, at trial, Detective Michael Reynolds testified that, as state troopers were about to begin searching the Carlisle Street house pursuant to the warrant, Appellant told him that "the police were the criminals and that marijuana plants are made by God and we had no right to interfere with God or interfere with enforcing the laws of marijuana." N.T. Trial, 11/14/17, at 77.

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and considering the totality of the circumstances, we agree with the trial court that the evidence was sufficient to prove Appellant's intent and ability to control the controlled substances found at the Carlisle Street and Fontain Street properties.[7]  Accordingly, we deny Appellant's sufficiency-of-the-evidence claim.

Judgment of sentence affirmed.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*

Date: <u>8/19/2020</u>

---

[7] Appellant mentions that, when the Carlisle Street warrant was executed, "there was a female in the house as well, in a bedroom on the second floor." Appellant's Brief at 27 (citation omitted).  This Court has stated that, "[w]here more than one person has equal access to where drugs are stored, presence alone in conjunction with such access will not prove conscious dominion over the contraband." ***Bricker***, 882 A.2d at 1016 (citation and brackets omitted). "Rather, the Commonwealth must introduce evidence demonstrating either [the a]ppellant's participation in the drug-related activity or evidence connecting [the a]ppellant to the specific room or areas where the drugs were kept." ***Id.*** (citation and brackets omitted).  Here, the Commonwealth introduced adequate evidence demonstrating that Appellant participated in the trafficking of marijuana.